STATE of Wisconsin,
Plaintiff-Respondent,

v.

Donald W. JORGENSEN,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2006AP1847–CR. Oral argument November 1, 2007.
—Decided June 13, 2008.*

2008 WI 60

(Also reported in 754 N.W.2d 77.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Martha K. Askins,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Aaron R. O'Neil,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished court of appeals' decision,[1] which affirmed the decisions of the Shawano County Circuit Court, James R. Habeck, Judge. Jorgensen was convicted of bail jumping, operating while intoxicated (fifth offense), operating with a prohibited alcohol concentration (fifth offense), and operating a motor vehicle

---

[1] *State v. Jorgensen,* No. 2006AP1847–CR, unpublished slip op. (Wis. Ct. App. Mar. 13, 2007).

after revocation. The circuit court denied Jorgensen's motion for post-conviction relief concluding that defense counsel was not ineffective but instead had made decisions based upon a reasonable trial strategy, and any error that occurred did not negatively impact Jorgensen. The circuit court also concluded that none of the errors constituted plain error. The court of appeals affirmed the circuit court's decision, and as a result, Jorgensen petitioned this court for review. On this appeal, Jorgensen asserts four theories of relief: plain error, in the interest of justice, ineffective assistance of counsel, and structural error. We conclude that the unobjected to errors of the judge and the prosecutor in this case are fundamental, obvious, and substantial; and the State has failed to meet its burden of proof that these errors were harmless. Thus, we conclude that these errors constitute plain error. As a result, we reverse the court of appeals' decision and remand to the circuit court for a new trial.

## I. FACTS

¶ 2. On November 10, 2004, Donald Jorgensen was scheduled for a plea and sentencing hearing, on a matter unrelated to this appeal, in the circuit court of Shawano County, before Judge James R. Habeck. Assistant District Attorney White (the prosecutor) informed the circuit court that Jorgensen and his attorney, James Chereskin, were having trouble communicating. The prosecutor relayed to the circuit court that she could "smell a strong odor of intoxicants" coming from Jorgensen, and she had requested that a deputy come and do a preliminary breath test. The circuit court ordered a preliminary breath test and informed Jorgensen that a test was necessary in order to determine whether he could understand that day's proceeding. The preliminary

breath test was conducted in court and witnessed by both the circuit court judge and the prosecutor.

¶ 3. Deputy Miller reported, in open court and on the record, Jorgensen's preliminary breath test result of 0.12. The judge noted, on the record as well, that Jorgensen had trouble following simple instructions, and the circuit court judge concluded that Jorgensen could not proceed. Jorgensen's previous cash bond was revoked, a new cash bond was ordered for violating the previous bond's no alcohol provision, and the circuit court ordered that Jorgensen be taken to the hospital to determine his blood alcohol concentration and to ensure that he could be safely taken into custody.

¶ 4. The Shawano County Sheriff's Department investigated the matter, and as a result, Jorgensen was charged with bail jumping, which arose out of a no alcohol provision in his previous bond, operating while intoxicated (fifth offense), operating with a prohibited alcohol concentration (fifth offense), and operating a motor vehicle after revocation.

¶ 5. Prior to trial, Attorney James Chereskin, who represented Jorgensen on previous matters, withdrew from representing Jorgensen on charges that arose out of the November 10, 2004, events. Attorney Chereskin cited irreconcilable differences as the reason for withdrawing. Attorney Joan Boyd was subsequently appointed to represent Jorgensen. However, on March 15, 2005, Attorney Boyd moved the circuit court to allow her to withdraw as Jorgensen's counsel due to a conflict of interest. Attorney Boyd explained, "I was in the courtroom on the day that [Jorgensen] was charged with these particular matters, and I don't think it's advisable for me to continue representing him." The circuit court allowed Attorney Boyd to withdraw, and

Attorney Gary Dodge (defense counsel) was appointed to represent Jorgensen on this matter.

¶ 6. On the morning of trial, August 31, 2005, Jorgensen stipulated to having four previous convictions for operating while intoxicated. The court explained to Jorgensen that if he did not stipulate to these prior convictions, the State would need to prove them to the jury. As a result and on the advice of his defense counsel, Jorgensen stipulated so as to remove the previous OWI convictions from the jury's consideration.

¶ 7. Also on the morning of trial, Assistant District Attorney White (the prosecutor) informed the circuit court that she wanted to enter the November 10 hearing transcript into evidence. The prosecutor asked the circuit court to take judicial notice of the transcript, and she asked the circuit court judge to read the transcript so as to avoid any accusation that she read it improperly. The defense counsel agreed that the circuit court should read the transcript to the jury, and the circuit court judge agreed to read the transcript.

¶ 8. After opening statements, the prosecutor asked the court to take judicial notice and admit the certified copy of the bail bond that pertained to the bail jumping charge. The defense counsel did not object. The circuit court judge informed the jury of the no alcohol provision and that this bond was in effect on November 10, 2004. During opening statements and again during closing arguments, the defense counsel told the jury that Jorgensen conceded to the bail jumping charge because he admitted to drinking alcohol at a bar near the courthouse.

¶ 9. The prosecutor also moved for the admission of the November 10 hearing transcript. The defense counsel did not object, and the circuit court judge then stated the following to the jury:

What I'm going to read to you is what happened back on November 10 of last year. This was taken down by a court reporter who was here that day. You see the court reporter here in front of you today. So you can understand how that happened.

So this is a part of the proceedings held before James R. Habeck, circuit judge in the circuit court for Shawano County Branch 1 held on November 10, 2004, in the city of Shawano Court House, reported by Nina Bostwick. The appearances that day were Catharine White as the assistant DA, for the state, James Chereskin as attorney appearing on behalf of the defendant, and then we had the defendant, Donald Jorgensen in person. And I'll read off the beginning part when I say they, that would be the person who said a particular topic. If I use the phrase, the Court, that means the judge, who happened to be me that day.

¶ 10. The circuit court judge then read from the November 10 hearing transcript:

THE COURT: State and Donald Jorgensen, is file 04–CT-79. He's here with Attorney Chereskin. What was your plan on proceeding today, Attorney White?

MS. WHITE: Your Honor this was set for a plea and sentencing. I've spoken with Attorney Chereskin briefly outside. He says he's having some problems communicating with his client today, that his client is indicating that there's some physical problems that he's having.

In the brief amount of time that I was close to his client, I could smell a strong odor of intoxicants from his client. I called over to the Sheriff's Department to have a deputy sent over with a preliminary breath test device. I'd ask the court to order that Mr. Jorgensen submit to a test.

THE COURT: We need to do that to figure out if you would understand what's happening today then,

147

sir. So here is an officer, Deputy Miller, and he's going to give you some instructions. We want to make sure you understand what's happening today.

(Deputy conducts test on defendant)

DEPUTY CHRIS MILLER: Your Honor, I did not get a sufficient breath sample in the reading on this, is at a, I barely got any breath at all, your Honor. He's going to be over a point one-oh (0.10).

MS. WHITE: What's the reading?

DEPUTY CHRIS MILLER: The reading is a point one two (0.12).

THE COURT: All right. And I observed the —

DONALD JORGENSEN: There it is right there.

THE COURT: I observed the prolonged instructions by the deputy and Mr. Jorgensen had trouble following the simple instructions, so I know he can't proceed today. How do you want to handle this, Attorney White?

MS. WHITE: Your Honor, I'd ask that the previous cash bond be revoked. It should be, the court should be aware that he has in interim now been convicted on September 23 of 2004 of OWI in Calumet County that occurred while he was out on bond on this case as well. He has another OWI pending in Outagamie pending, and now we have him consuming intoxicants in violation of his bond. So I'm asking that the previous bond be revoked, a ten thousand dollar cash bond be set in this matter, again with the condition that he consume no alcohol. And I'm going to be asking that the officer take him to the Shawano Medical Center for a blood draw as evidence of a crime of bail jumping.

THE COURT: Attorney Chereskin.

148

MR. CHERESKIN: Your Honor, my client has indicated to me that if there is any alcohol in his system, it's a result of liquid Tylenol or NyQuil, and he indicates to me that he has taken NyQuil in that fashion for 12 years. He also indicated to me that he has not consumed any alcohol, but instead is suffering from the after effects of a stroke.

. . . .

THE COURT: ... I'm concerned about Mr. Jorgensen's health. So I'm going to revoke the existing bond. Our Shawano County bond, so we're clear, had a no alcohol provision. It appears to me Mr. Jorgensen violated that, so I do have to increase the cash bond amount. It's an unusual case. I'm going to go to ten thousand dollars cash because of the circumstances here, and we'll have, Mr. Jorgensen will have to get checked out by the hospital just to make sure that he's okay to take into custody, based on what I've seen and heard here today, so.

¶ 11. After reading from the transcript, the circuit court judge stated, "[t]hat's what happened in court here last November 10."

¶ 12. During the course of the trial, Deputy Miller, Sergeant Lenzner, and Pamela Faehling testified as State's witnesses, and Jorgensen testified on his own behalf. Deputy Miller testified that he could smell "a strong odor of intoxicants coming from [Jorgensen's] person," and Jorgensen had trouble opening the door to the courtroom. He further testified that Jorgensen told him he had "drank two bottles of NyQuil." Deputy Miller stated that Jorgensen also told him that he had no alcohol and no NyQuil after he left his home.[2] Sergeant Lenzner testified that Pamela Faehling,

_____

[2] Deputy Miller testifies twice about what Jorgensen said he drank on November 10. At first Deputy Miller states that

Jorgensen's friend, had told the officer that she observed Jorgensen "drink an entire bottle, a quart bottle, of Peppermint Schnapps" on the morning of November 10, 2004, before leaving for the courthouse.

¶ 13. Faehling, however, gave contradictory testimony at trial as to whether Jorgensen drank any alcohol before coming to court. She recanted the statement given to Sergeant Lenzner and testified that Jorgensen did not drink Peppermint Schnapps on the morning of November 10, 2004. In response to persistent questioning by the prosecutor about Jorgensen's drinking on the morning of November 10, 2004, Faehling often replied "no" or something to the effect that she did not remember if Jorgensen had drank that morning. However, Faehling did testify that Jorgensen drove himself to the courthouse on November 10, 2004.

¶ 14. Jorgensen testified on his own behalf. He testified that he did not drink any alcohol before he left his residence on the morning of November 10, 2004. Previously, however, Jorgensen told Deputy Miller that he did not drink any alcohol after he left his house. He testified that, after arriving at the courthouse but before his hearing, he drank an entire bottle of NyQuil, and he had two Tom Collins at a bar just a few blocks from the courthouse.

¶ 15. During the closing argument, the prosecutor referenced the November 10, 2004, hearing. She stated:

---

Jorgensen said he had two bottles of NyQuil, but there is no indication of when Jorgensen said this occurred. The second time, Deputy Miller states that Jorgensen stated he had no alcohol and no NyQuil after he left his house. However, the question Jorgensen was reponding to when he gave this answer was: Did you have any alcohol to drink after you left your residence to come to court?

All of these offenses happened back on November 10, 2004 and I think that you've all, through the testimony and exhibits that have been entered into evidence, been given a fairly clear picture of what went on that day. And it's unusual because what went on that day went on in this very room. This is where it all happened. And usually when I come before a jury to do my closing argument or my summing up, what I tell the jury is, I didn't get to see any of it either. I have to learn about what happened from the witnesses, the same as you do. In this case, I was there for some of it. And you are actually in the same place where some of it happened, so you're having a little bit of a unique experience for a juror.

. . . .

. . . And as you know, I informed the Court that I could smell that he had been drinking when I talked to him briefly in the hallway with his attorney. And we called over for a deputy to come with preliminary breath test device, because it was a condition of his bond that he not drink.

. . . .

I don't know what he drank at home. [Pam Faehling] showed a bottle to Officer Lenzner, a bottle of Peppermint Schnapps, and said he drank it that morning before he left. I don't know, I wasn't there.

All I know is when he was in court he was drunk. And when he had the blood drawn that he was drunk. And he said that afternoon, while he was still drunk and before he had time to think and come up with a better lie that he had nothing to drink after he left home.

. . . This is a trial that is a search for truth. The truth of the matter is that Mr. Jorgensen is a chronic alcoholic. I don't know if we're ever going to get him to believe that,

151

but that's the truth. The truth of the matter is Mr. Jorgensen drove to court that day and he was drunk, and it was a very foolish thing for him to do. . . .

¶ 16. Jorgensen was convicted of all charges: bail jumping, operating while intoxicated, operating with a prohibited alcohol concentration, and operating a motor vehicle after revocation.

¶ 17. At the post-conviction hearing, Jorgensen argued in favor of a new trial on three grounds: plain error, ineffective assistance of counsel, and in the interest of justice. The circuit court concluded that Jorgensen's intoxication was not a defense pursued by Jorgensen; rather, his defense involved whether he drove himself on November 10, 2004. The circuit court concluded that as a matter of trial strategy, the defense counsel determined that the transcript was less harmful than having the judge and the prosecutor testify. While the circuit court expressed some confrontation clause concerns with regard to the State's closing argument, the circuit court concluded that the prosecutor's statements were based on the transcript and with regard to intoxication, which was not really in dispute. Moreover, the circuit court concluded that the defense counsel chose not to object during closing argument as a matter of trial strategy. The circuit court concluded, "I really don't see any negative impact that's apparent to me that would constitute plain error . . . ." As a result, the circuit court denied Jorgensen's motion for post-conviction relief.

¶ 18. The court of appeals, in an unpublished decision, affirmed the circuit court. On Jorgensen's ineffective assistance of counsel claim, the court of appeals concluded that while the prosecutor's comments during her closing argument were highly inappropriate, "there

is no probability that the outcome of the trial would have been different absent counsel's errors." The court of appeals also concluded that any errors that arose out of reading the transcript in court were not prejudicial.

¶ 19. Jorgensen also argued in favor of a new trial on the bases of plain error and in the interest of justice. On the plain error claim, the court of appeals concluded that Judge Habeck's involvement did not give an appearance of bias. Thus, failing to object to his involvement was not plain error. Lastly, the court of appeals concluded that the real controversy had been tried, and thus, a reversal in the interest of justice was not warranted. In a dissent, Chief Judge Cane concluded that a new trial was warranted because of the prosecutor's improper statements during closing argument.

## II. PLAIN ERROR DOCTRINE

¶ 20. Jorgensen's defense counsel did not object to the circuit court's reading of the November 10 hearing transcript or to the prosecutor's improper remarks during closing argument. As a result, Jorgensen now asserts four theories of relief: plain error, in the interest of justice, ineffective assistance of counsel, and structural error. We conclude that the facts of this case give rise to plain error and thus warrant a new trial. First, the errors were fundamental, obvious, and substantial. In this case, Jorgensen was denied basic constitutional protections. Second, the State has failed to meet its burden of proof that these errors were harmless. Thus, we conclude that the errors constitute plain error.

¶ 21. Wisconsin Stat. § 901.03(4) (2003–04) recognizes the plain error doctrine.[3] The plain error doctrine

---

[3] Wisconsin Stat. § 901.03(4) states: "Nothing in this rule precludes taking notice of plain errors affecting substantial

allows appellate courts to review errors that were otherwise waived by a party's failure to object. *State v. Mayo,* 2007 WI 78, ¶ 29, 301 Wis. 2d 642, 734 N.W.2d 115. *See also* 7 Daniel D. Blinka, *Wisconsin Evidence* § 103.7 (2d ed. 2001). Plain error is " 'error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time.' " *State v. Sonnenberg,* 117 Wis. 2d 159, 177, 344 N.W.2d 95 (1984) (citation omitted). The error, however, must be "obvious and substantial." *Id.* Courts should use the plain error doctrine sparingly. *Id.* For example, " 'where a basic constitutional right has not been extended to the accused,' " the plain error doctrine should be utilized. *Id.* (citing *Virgil v. State,* 84 Wis. 2d 166, 195, 267 N.W.2d 852 (1978) (Beilfuss, C.J., concurring); "Wisconsin courts have consistently used this constitutional error standard in determining whether to invoke the plain error rule." *State v. King,* 205 Wis. 2d 81, 91, 555 N.W.2d 189 (Ct. App. 1996) (citing to a number of Wisconsin cases applying the plain error doctrine).

¶ 22. However, " 'the existence of plain error will turn on the facts of the particular case.' " *Mayo,* 301 Wis. 2d 642, ¶ 29 (citing *Virgil,* 84 Wis. 2d at 190–91). The quantum of evidence properly admitted and the seriousness of the error involved are particularly important. *Id.* "Erroneously admitted evidence may tip the scales in favor of reversal in a close case, even though the same evidence would be harmless in the context of a case demonstrating overwhelming evidence of guilt." *Virgil,* 84 Wis. 2d at 191. Thus, no bright-line

rights although they were not brought to the attention of the judge." All references to Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

rule exists to determine automatically when reversal is warranted. *See Mayo,* 301 Wis. 2d 642, ¶ 29.

¶ 23. If the defendant shows that the unobjected to error is fundamental, obvious, and substantial, the burden then shifts to the State to show the error was harmless.[4] *Id.* (citing *King,* 205 Wis. 2d at 93). To determine whether an error is harmless, this court inquires whether the State can prove " 'beyond a reasonable doubt that a rational jury would have found the

---

[4] "It is also consistent with federal case law for us to use a harmless error analysis in determining whether to invoke the plain error doctrine." *State v. King,* 205 Wis. 2d 81, 92, 555 N.W.2d 189 (Ct. App. 1996). *See also United States v. Olano,* 507 U.S. 725, 734 (1993). However, unlike the state of Wisconsin where the State holds the burden, in the federal system the burden is on the defendant to show that the error was harmless. *King,* 205 Wis. 2d at 93. The concurrence advocates for stating the specific language that federal courts use in their plain error doctrine analysis. Instead, the majority decision today incorporates existing Wisconsin case law on that issue in order to clarify Wisconsin's plain error doctrine. *See* ¶¶ 21 and 22 of this opinion. While the concurrence questions what would qualify as fundamental and substantial error under the majority's test, the federal doctrine, as espoused by the concurrence, raises the same question. The concurrence also asks whether a fundamental and substantial error can be harmless. Under our analysis, any error that satisfies the first prong of our plain error doctrine, i.e., any error that is fundamental, obvious, and substantial, must then undergo the second prong of whether that error is nonetheless harmless. Today we find that the errors constitute plain error. In this case, we are not presented with facts that satisfy the first prong but are harmless under the second prong. In a future case, however, an error may satisfy the first prong but nonetheless be deemed harmless under the second prong's seven factor test, and thus, the error would not constitute plain error.

defendant guilty absent the error[].' "[5] *Mayo*, 301 Wis. 2d 642, ¶ 47 (citation omitted). This court has identified several factors to assist in determining whether an error is harmless: (1) the frequency of the error; (2) the importance of the erroneously admitted evidence; (3) the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; (4) whether the erroneously admitted evidence duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case. *Id.*, ¶ 48.[6] If the State fails to meet its burden of proving that the errors were harmless, then the court may conclude that the errors constitute plain error.

¶ 24. Wisconsin appellate courts have applied the plain error doctrine to evaluate unobjected to error that is fundamental, obvious and substantial.[7] In *Mayo*, this

---

[5] The harmless error test has also been stated as follows: "[T]he error is harmless if the beneficiary of the error proves "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." " *State v. Mayo*, 2007 WI 78, ¶ 47, 301 Wis. 2d 642, 734 N.W.2d 115 (citing *State v. Anderson*, 2006 WI 77, ¶ 114, 291 Wis. 2d 673, 717 N.W.2d 74, quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[6] *See State v. Hale*, 2005 WI 7, ¶¶ 61–77, 277 Wis. 2d 593, 691 N.W.2d 637 (applying the harmless error factors); *State v. Stuart*, 2005 WI 47, ¶¶ 41–57, 279 Wis. 2d 659, 695 N.W.2d 259 (applying the harmless error factors).

[7] *See King*, 205 Wis. 2d at 91–95 (concluding that the confrontation clause violation, which admitted a co-defendant's incriminating statements, was harmless); *State v. Sonnenberg*, 117 Wis. 2d 159, 177–80, 344 N.W.2d 95 (1984) (concluding that a witness' irrelevant testimony was erroneously admitted but harmless); *State v. Gustafson*, 119 Wis. 2d 676, 687–89, 350 N.W.2d 653 (1984) (concluding that the admission of a defendant's no contest plea and evidence of his delinquency adjudication did not deny the defendant of a constitutional right); *Virgil v. State*, 84 Wis. 2d 166, 179–94, 267 N.W.2d 852

court analyzed a number of errors. We concluded that even though disparaging remarks by both the prosecutor and the defense counsel were improper, those errors did not require a new trial based on plain error or in the interest of justice. *Id.*, ¶ 42. In *Mayo,* the prosecutor stated that the role of the defense counsel was to "get his client off the hook and not to see justice done but to see his client was acquitted." *Id.* The defense counsel, on the other hand, analogized the prosecutor to Saddam Hussein. This court concluded that while the statements were improper, they were not prejudicial when viewed in context of the whole trial and thus a due process violation had not occurred.[8] *Id.*, ¶ 43. During her closing argument, the prosecutor also commented on the process she used for reviewing files and making charging decisions. However, the court found that these comments did not provide the jury with information that would unfairly influence the jury's decision and infect the trial with unfairness. *Id.*, ¶ 45.

¶ 25. On the other hand, the prosecutor's statements in *Mayo,* which she made during her opening statement and examination of State's witnesses, vio-

---

(1978) (concluding that (1) out of court statements that were not inconsistent but admitted anyway did not qualify as plain error; (2) assistant district attorney's testimony about a plea bargain made with a co-defendant did not qualify as plain error; (3) the admission of a co-defendant's guilty plea did not qualify as plain error; and (4) the admission of a co-defendant's testimony through a police officer was a confrontation clause violation that was not harmless).

[8] To determine whether a prosecutor's comments give rise to a due process violation, the court must ask whether the statements " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Mayo,* 301 Wis. 2d 642, ¶ 43 (quoting *State v. Davidson,* 2000 WI 91, ¶ 88, 236 Wis. 2d 537, 613 N.W.2d 606).

lated the defendant's constitutional right to remain silent because the statements referenced the defendant's pre-*Miranda* silence. However, the court concluded that the error of commenting on pre-*Miranda* silence was harmless because the errors were infrequent and not prejudicial. *Id.*, ¶¶ 49–52.

¶ 26. In *State v. Davidson,* 2000 WI 91, ¶¶ 81–89, 236 Wis. 2d 537, 613 N.W.2d 606, this court analyzed whether a prosecutor's statements during closing arguments required reversal under the plain error doctrine. The prosecutor commented on the credibility of a witness and asked the jury, "do you believe Tina as I do." *Id.*, ¶ 82. Thus, the prosecutor inappropriately vouched for a witness.

¶ 27. The second comment by the prosecutor in *Davidson* resulted in the jury hearing insignificant, unsworn testimony.[9] *Id.*, ¶ 83. This court concluded that the prosecutor's statements were limited in scope and not "so egregious as to constitute plain error." *Id.*, ¶ 88. The improper statements did not infect the trial with unfairness so as to render the resulting conviction a denial of due process. *Id.*

---

[9] The relevant portion in *Davidson* reads:

The second remark occurred during the prosecutor's rebuttal. During cross-examination, the prosecutor had asked the defendant's wife whether she said 'that fucker' when Tina H.'s mother first called and told her about the assault. The defendant's wife denied making the statement, and the prosecutor did not question Tina H.'s mother on the matter. The defense commented during closing arguments that the prosecutor's own witness never verified this statement. On rebuttal, the prosecutor said, 'Counsel made reference to the district attorney's question about that profanity word, that f—er, and he says my witness didn't even say that on the stand, and you know what, she didn't. You know why she didn't? I didn't ask the question.'

*Davidson,* 236 Wis. 2d 537, ¶ 83.

158

¶ 28. In the case at issue, the judge and the prosecutor made several errors during trial, and defense counsel did not object. For example, the following errors occurred as a result of the court reading the transcript: (1) The admission of other acts such as prior convictions and pending charges for operating while intoxicated. *See State v. Alexander*, 214 Wis. 2d 628, 644–51, 571 N.W.2d 662 (1997) (criticizing the admission of prior convictions when the defendant stipulates to those convictions and the only purpose of admission is to prove a status element); *see also* Wis. Stat. § 904.04(2) (precluding the admission of other crimes generally unless an exception applies). (2) The admission of the fact that a preliminary breath test was conducted and the results of that test. *See* Wis. Stat. § 343.303 (rendering a preliminary breath test inadmissible unless certain exceptions apply). (3) The admission of inadmissible hearsay including "testimony" from the judge and the prosecutor. *See* Wis. Stat. § 908.02. (4) The admission of information before the jury that was not subject to confrontation, such as the judge's remarks and the prosecutor's commentary regarding the preliminary breath test, their personal observations of Jorgensen on November 10, and their conclusions about Jorgensen's guilt. *See* Article I, Section 7 of the Wisconsin Constitution and the Sixth Amendment of the United States Constitution. (5) The prosecutor's assertion of personal knowledge of the facts. *See* SCR 20:3.4(e) (2004) (stating a lawyer shall not "assert personal knowledge of facts in issue except when testifying as a witness"); *State v. Jackson,* 2007 WI App 145, ¶ 22, 302 Wis. 2d 766, 735 N.W.2d 178. (6) The admission of information regarding the judge's participation, including his perceptions and conclusions, at the prior proceeding. *See generally Withrow v. Larkin,* 421 U.S. 35, 56 (1975) (concluding that a judge's pretrial involvement

does not raise any constitutional barrier against the judge's presiding over the criminal trial). However, the jury should not have learned of highly prejudicial, inadmissible evidence that included the judge's involvement and conclusions as well as the prosecutor's involvement and conclusions.

¶ 29. Unobjected to errors also occurred during the prosecutor's closing argument. The prosecutor's closing remarks highlighted the highly prejudicial, inadmissible information. Like the judge's "testimony," the prosecutor's "testimony" was not subject to confrontation.

¶ 30. The prosecutor, during closing argument, identified the defendant as a "chronic alcoholic":

> This is a trial that is a search for truth. The truth of the matter is that Mr. Jorgensen is a chronic alcoholic. I don't know if we're ever going to get him to believe that, but that's the truth. The truth of the matter is Mr. Jorgensen drove to court that day and he was drunk, and it was very foolish thing for him to do. . . .
>
> 

¶ 31. This commentary was improper. First, it is inappropriate for an attorney to allude to a matter not supported by admissible evidence. *See* SCR 20:3.4(e); *State v. Freiberg*, 35 Wis. 2d 480, 484, 151 N.W.2d 1 (1967) (stating that alcoholism is a disease that should be proven by expert medical opinion). Second, it is improper for a prosecutor to provide the jury with information, which allows the jury to consider facts not in evidence when determining guilt. *See State v. Smith*, 2003 WI App 234, ¶ 23, 268 Wis. 2d 138, 671 N.W.2d 854. Third, while the statement is not evidence because it was stated during closing arguments, it is still useful to assert that labeling Jorgensen a "chronic alcoholic" is not relevant, and it is highly prejudicial. *See* Wis. Stat.

§§ 904.01 and 904.03. Fourth, the context in which the "chronic alcoholic" comment arose comes dangerously close to asking the jury to convict Jorgensen of OWI because he is an alcoholic who may not acknowledge that he has a problem. *See generally Robinson v. California,* 370 U.S. 660, 666 (1962) (rendering a statute unconstitutional because it punished the status of having a narcotics addiction rather than the act of manufacturing, selling, purchasing, or possessing narcotics).

¶ 32. This commentary was not heard by the jury in a vacuum. The "chronic alcoholic" statement occurred in a trial where the jury was informed of: (1) the defendant's previous OWI convictions; (2) the defendant's pending OWI charges; (3) the judge ordering a preliminary breath test; (4) the trial judge and the trial prosecutor witnessing the November 10 events; (5) the judge's determination that Jorgensen needed to be sent to the hospital for evaluation; and (6) the trial judge and prosecutor's conclusions about Jorgensen's intoxication and his guilt.

A. Constitutional Claims

¶ 33. Relevant to a plain error analysis in this case are the unobjected to errors that occurred by the judge and the prosecutor. In this case, Jorgensen was denied his right to confrontation and due process because of the transcript being read by the trial judge, who also presided over the November 10 hearing, and the prosecutor's inappropriate statement during closing argument.

1. Confrontation Clause

¶ 34. " 'The Confrontation Clause of the United States and Wisconsin Constitutions guarantee criminal

defendants the right to confront witnesses against them.'" *State v. Jensen,* 2007 WI 26, ¶ 13, 299 Wis. 2d 267, 727 N.W.2d 518 (citation omitted); *see also Crawford v. Washington,* 541 U.S. 36, 42 (2004), U.S. Const. amend. VI;[10] Wis. Const. art. I, § 7.[11] By reading the November 10 hearing transcript at Jorgensen's criminal trial, which essentially provided the jury with the judge's and the prosecutor's conclusions about Jorgensen's guilt, the circuit court itself seemingly testified against the defendant, and the prosecutor essentially testified against the defendant by virtue of the judge reading the transcript from the November 10 hearing. This highly prejudicial and largely inadmissible evidence was not subject to cross-examination.

¶ 35. Here, the circuit court seemed to testify against the defendant when it stated the following: (1) Jorgensen was having difficulty following simple instructions due to intoxication; and (2) Jorgensen violated the no alcohol provision of his bond. These statements directly related to Jorgensen's alleged intoxication and the elements of the offenses charged for which Jorgensen was to be presumed innocent. It remains the State's burden to prove those elements beyond a reasonable doubt. Under Wis. Stat. § 946.49(1), the State must prove that the defendant violated a provision of his or her bond. In this case, the terms of the bond and the defendant's knowing conduct, consuming alcohol, in violation of those terms are elements that the State must

---

[10] The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him[.]"

[11] Article I, Section 7 of the Wisconsin Constitution states that "[i]n all criminal prosecutions the accused shall enjoy the right ... to meet the witnesses face to face."

prove in order to convict the defendant of bail jumping. *See* Wis JI—Criminal 1795. Under Wis. Stat. § 346.63(1)(a), the State must prove the defendant was under the influence of an intoxicant at the time the defendant drove on a highway. *See* Wis JI—Criminal 2663. The State's burden was decreased because of the errors made at trial.

¶ 36. The circuit court's commentary essentially constituted unsworn testimony against the defendant, and it reached legal conclusions that should otherwise rest solely within the province of the jury. Jorgensen never had the opportunity to question the circuit court's observations. The opportunity to question one's accusers is central to our adversarial system. Without confrontation, potential errors, mistakes of fact, and ambiguities are neither examined nor tested by opposing counsel. Since these observations likely helped to establish elements of the crimes charged, these were not trivial comments by the circuit court. Moreover, the circuit court's observations informed the jury that the court believed Jorgensen was intoxicated, violated his bond, and was guilty.

¶ 37. Also, by virtue of the circuit court reading the November 10 hearing transcript, the prosecutor essentially "testified" against the defendant without being subject to confrontation. The prosecutor's remarks at the hearing forwarded the following assertions: (1) Jorgensen was having trouble communicating with his lawyer; (2) he emitted a strong odor of intoxicants; (3) Jorgensen was convicted of another OWI in Calumet County while out on a Shawano County bond; (4) he had a pending OWI in Outagamie County; and (5) Jorgensen violated his bond.

163

¶ 38. Despite the evidentiary and procedural errors associated with this testimony, Jorgensen never had the opportunity to confront his accuser. Thus, the defendant was deprived of the opportunity to test the prosecutor's statements. In addition, the uncontroverted, highly prejudicial, and largely inadmissible evidence appeared to be cloaked with the judge's approval. Without the State introducing the requisite evidence, the jury was informed that the prosecutor believed Jorgensen was intoxicated on November 10, he had violated his bond, and that he was guilty of OWI in the past, had pending OWI charges in another county, and was now guilty of the crimes charged in this case. Testimony from a prosecutor is difficult enough to overcome, but it is impossible for a defendant to test or counter a prosecutor's "testimony" when the defendant is denied his right to confront the prosecutor as a witness. It is even more insurmountable when it appears that the judge is approving of the prosecutor's version of the evidence because the judge is reading the observations to the jury and states, "[t]hat's what happened in court here last November 10."

¶ 39. Jorgensen's right to confrontation was also violated during the prosecutor's closing argument. The prosecutor took what the jury had improperly heard during the trial a step further. She "testified" that Jorgensen was a "chronic alcoholic" who did not acknowledge his problem, that on November 10 she smelled a strong odor of intoxicants from him, and that she knew Jorgensen was drunk that day in court. While the State did produce testimony regarding Jorgensen's level of intoxication on the date in question through the toxicologist, Jorgensen was still denied his right to

confrontation and the right to have the State prove its case beyond a reasonable doubt. However, the presence of potentially duplicative evidence is only relevant to whether or not the error was harmless and is but one factor in that analysis. Moreover, this is not the only constitutional error that occurred during the course of the trial.

## 2. Due Process Clause

¶ 40. The due process clause of both the United States and Wisconsin Constitution prohibits the government from depriving a person of due process of law.[12] By virtue of the prosecutor's improper comments, Jorgensen was denied his right to due process. We recognize that the line between permissible and impermissible statements is not easy to discern. However, " 'where the prosecutor goes beyond reasoning from the evidence to a conclusion of guilt and instead suggests that the jury arrive at a verdict by considering factors other than the evidence,' " the statements are impermissible. *Smith,* 268 Wis. 2d 138, ¶ 23 (quoting *State v. Draize,* 88 Wis. 2d 445, 454, 276 N.W.2d 784 (1979)). Improper comments, however, do not necessarily give rise to a due process violation. To determine whether a prosecutor's comments constitute a due process violation, the court must ask whether the statements " 'so infected the trial with unfairness as to make the result-

---

[12] The Fourteenth Amendment to the United States Constitution provides that "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

Article 1, Section 8 of the Wisconsin Constitution provides that "[n]o person may be held to answer for a criminal offense without due process of law . . . ."

ing conviction a denial of due process.'" *Mayo,* 301 Wis. 2d 642, ¶ 43 (citation omitted).

¶ 41. Accordingly, not all inappropriate statements by a prosecutor result in a due process violation that gives rise to plain error. For example, in *Mayo, King, Gustafson,* and some statements analyzed in *Virgil,*[13] the improper statements were about the role of an attorney, charging decisions by prosecutors, a co-defendant's guilty plea, or the improper statements were irrelevant to the issues. None of the errors infected those trials with unfairness so as to create a due process violation.

¶ 42. In this case, however, improper statements denied Jorgensen his right to due process because they infected the trial with unfairness. The errors occurred repeatedly and in different forms at several junctures of the trial; the statements were related to elements of the offenses charged, highly prejudicial, largely inadmissible, and cloaked with judicial approval. This is not merely "a slip of the tongue" during closing argument or in questioning a witness. Improper evidence was magnified by virtue of the circuit court reading the November 10 hearing transcript and the prosecutor using the transcript to make improper comments during closing argument. In this case, the jury improperly learned that the prosecutor had personal knowledge of facts at issue, of the prosecutor's actions at the November 10 hearing, of her conclusions about Jorgensen's intoxication, and her opinion that Jorgensen was guilty of violating his bond and thus guilty of bail jumping. In addition, the jury improperly learned that Jorgensen had prior OWI convictions and a pending OWI case. Presumably, Jor-

---

[13] See footnote 7 for references to *Gustafson, Virgil,* and *King.*

166

gensen stipulated to these prior convictions in an effort to keep this information from the jury. During the closing argument, the jury was urged to reach certain conclusions when it was told that the prosecutor knew Jorgensen was intoxicated on November 10 and Jorgensen was an alcoholic who did not acknowledge his problem.

¶ 43. All of these improper comments invited the jury to consider that Jorgensen had a significant problem with alcohol and to convict him based on inflammatory and inadmissible evidence. Moreover, when considering the context in which the "chronic alcoholic" statement was used, the prosecutor highlighted the inadmissible information read from the transcript and likely infected the trial with unfairness. Information such as this is ordinarily excluded from the jury out of concern for how the jury will use the information. Providing this information allows the jury to conclude that because Jorgensen has an alcohol problem and has driven while intoxicated in the past, he likely drove while intoxicated on this occasion.

¶ 44. Because of the significance, timing, repetition, and manner in which the improper statements were presented to the jury, they infected the trial with unfairness. These highly prejudicial errors occurred at critical junctures of the trial. Their use at trial denied Jorgensen his right to due process.

B. Harmless Error

¶ 45. Once the defendant establishes that unobjected to errors are fundamental, obvious, and substantial, the State bears the burden of proving that the errors

are harmless. Here, the defendant has established that the errors are fundamental, obvious, and substantial; and thus, we turn to the State's argument that the errors are harmless. The State argues that any errors—the denial of confrontation and due process—were harmless because Jorgensen did not contest that he was intoxicated, and the evidence of intoxication was overwhelming. However, to conclude the errors are harmless solely because the State showed intoxication through other means would render the rest of the harmless error factors worthless. Instead, the court considers the following factors to determine whether an error was harmless: (1) the frequency of the error; (2) the importance of the erroneously admitted evidence; (3) the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence; (4) whether the erroneously admitted evidence duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case. *Mayo*, 301 Wis. 2d 642, ¶ 48. Under the facts of this case, we are compelled to conclude that the errors were not harmless.

¶ 46. Factor one, the frequency of the error: It is significant that the constitutional errors served as bookends to this short trial. The very first evidence presented in this trial was the circuit court reading the November 10 hearing transcript. During closing argument, the prosecutor bolstered that evidence by "testifying" about her personal knowledge of the November 10 events and that Jorgensen was a "chronic alcoholic." If the errors were grouped together, they only occurred twice, but when the trial is less than one day in length and the constitutional errors occurred at the beginning of the State's case and then again during the State's closing

168

argument, the frequency and timing is troubling, even if not dispositive.

¶ 47. Factor two, the importance of the erroneously admitted evidence: The erroneously admitted evidence directly pertained to elements of the crimes charged. The inappropriate testimony in this case was not like the more "benign" comments of past cases, which included statements about the role of attorneys or how prosecutors charge cases. The evidence does not occur in a brief moment and is then glossed over as seemingly irrelevant. Rather, the evidence in this case directly addressed elements of the crimes charged, and it was presented by the judge and highlighted by the prosecutor. The State bore the burden of proving each and every element of the crimes charged beyond a reasonable doubt. Therefore, these were far from incidental statements before the jury. Here, not only was the improper information admitted before the jury, it was directly pertinent to the State's case. Thus, the erroneously admitted evidence was crucial.

¶ 48. Factor three, the presence or absence of corroborating or contradicting evidence: The evidence was not overwhelming with respect to the timing of the alleged intoxication, and without the judge reading the transcript, the State's presentation of evidence of bail jumping was lean. Thus, the State's case was significantly enriched by the information the jury gleaned from the improperly admitted transcript.

¶ 49. Factor four, duplicative evidence: Absent the improper evidence before the jury, the record contains competing evidence about Jorgensen's intoxication at the time of driving. Deputy Miller testified that Jorgensen struggled with opening the courtroom door on November 10 and that he had a strong odor of intoxicants emanating from his person. The toxicologist testi-

fied that Jorgensen's "blood ethanol concentration [was] 0.174 grams per 100 milliliters." However, the toxicologist did not explain or elaborate on the significance of that number as it pertained to legal limits of alcohol in the body while driving. Faehling's testimony contradicted the statement she gave to Sergeant Lenzner. Neither Jorgensen's personal testimony nor Faehling's personal testimony at trial necessarily established that Jorgensen was intoxicated at the time of driving. A significant amount of testimony attributable to Jorgensen's intoxication comes from either the circuit court or the prosecutor through the transcript reading. While arguing that duplicative evidence exists is likely the State's strongest argument, it alone does not necessarily carry the day.

¶ 50. Factor five, the nature of the defense: The State argues that the erroneously admitted evidence goes only to intoxication, which was not really contested. Thus, the State argues that the erroneously admitted evidence was not crucial. However, Jorgensen never conceded that he was intoxicated prior to driving. In fact, Jorgensen testified at trial that he had nothing to drink prior to leaving his house that day.[14] He conceded at trial that he drank alcohol at a local bar prior to coming to the courthouse and that he had consumed NyQuil that day. While part of the defense's theory was that he did not drive, the other part was that he did not drink prior to driving but rather only drank after he arrived downtown. Thus, the nature of the defense does not render the potentially "duplicative evidence" of intoxication dispositive.

---

[14] While this is contrary to what he said on November 10 to Deputy Miller, we find it significant that, at trial, he repeatedly denied drinking alcohol prior to driving.

¶ 51. Factors six and seven, nature of and strength of the State's case: A significant issue at a trial of this sort is whether Jorgensen was under the influence of an intoxicant at the time of driving. As stated when discussing factor three of the harmless error test, the State's proof that Jorgensen was intoxicated at the time he drove his car and the evidence of each element of bail jumping was lean, absent the court reading the transcript. There is significant question as to whether the jury held the State to its burden of proof or whether it cast aside any weaknesses in the State's case when it learned from the judge and the prosecutor that Jorgensen came to court intoxicated, had prior convictions for OWI, a pending OWI charge, a bond violation as a result of consuming alcohol, was ordered by the presiding judge to take a preliminary breath test, the results of the preliminary breath test, and that the judge sent him to the hospital out of concern for his intoxication. The jury should not have heard this inflammatory information through the judge and the prosecutor, if at all. The State's case was certainly bolstered from the information the jury gleaned from the improperly admitted transcript. In effect, the State's high burden of proof was reduced because the repeated, highly prejudicial, inadmissible evidence invited the jury to convict Jorgensen without the requisite properly admitted evidence.

¶ 52. By applying the harmless error factors, we conclude the errors here were not harmless and that the State has not met its burden of proof in that regard. Under the facts presented, we simply cannot say that it is clear beyond a reasonable doubt that a rational jury would have found Jorgensen guilty absent the errors. The errors were so fundamental, obvious and substantial that we cannot discern whether absent these errors, the State would still have successfully convicted Jor-

gensen. These errors likely affected the jury's verdict. The judge, by reading the transcript, may have appeared to be vouching for the State's case and "testifying" against the defendant without being subject to cross-examination. The jury learned from both the prosecutor and the circuit court that Jorgensen was intoxicated on November 10, 2004, and the jury learned from the prosecutor that Jorgensen drove while under the influence in the past and was a "chronic alcoholic" —at least in the eyes of the prosecutor.

¶ 53. As a result, Jorgensen was convicted without the constitutional guarantees due to him. The jury heard inadmissible, prejudicial evidence that violated Jorgensen's right to confrontation and due process, and it likely affected the jury's verdict and willingness to convict.

### III. CONCLUSION

¶ 54. As a result of the November 10 hearing transcript being read to the jury and the State's closing argument, Jorgensen was denied basic constitutional rights at critical junctures of his short trial. We conclude that the unobjected to errors of the judge and the prosecutor in this case are fundamental, obvious, and substantial; and the State has failed to meet its burden of proof that these errors were harmless. Thus, we conclude that these errors constitute plain error. As a result, we reverse the court of appeals' decision and remand to the circuit court for a new trial. Accordingly, we do not go further to reach a conclusion on the basis of structural error, in the interest of justice, or ineffective assistance of counsel.

*By the Court.*—The decision of the court of appeals is reversed, and the cause remanded to the circuit court for further proceedings consistent with this opinion.

¶ 55. SHIRLEY S. ABRAHAMSON, C.J. (*concurring*). The plain error doctrine permits judicial review of an error affecting substantial rights, despite a party's failure to object to the error. *See* Wis. Stat. § 901.03(4). I agree with the majority opinion's holding that the unobjected-to errors in the present case constitute plain error. I write separately in order to clarify the plain error analysis.

¶ 56. Under a plain error analysis, as I understand it, a defendant must show (1) that there was an error, and (2) that the error is "plain" (that is, "obvious" or "clear"). The State then must show that the error is harmless, that is, that the error does not affect substantial rights.[1] This analysis sets forth a procedure in which the court first identifies the error, then determines whether the error is obvious or clear, and finally determines whether the error affected substantial rights.

¶ 57. These three steps comply with the text of Wis. Stat. § 901.03(4), governing plain error, which provides as follows:

Plain Error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the judge.

¶ 58. The majority opinion concludes that an error constitutes a "plain error" when the error is "fundamental, obvious, and substantial" and when the State fails to meet its burden of proving that the error is

---

[1] Wisconsin law on plain error differs from the federal analysis in one important respect, namely that in Wisconsin the burden is on the State to show that the error is harmless. *See State v. Mayo*, 2007 WI 78, ¶ 29, 301 Wis. 2d 642, 734 N.W.2d 115; *United States v. Olano*, 507 U.S. 725, 734–35 (1993).

harmless.[2] The majority opinion's requirement that an error be "fundamental" and "substantial" seems to render redundant the separate requirement that the error not be harmless. What is a fundamental and substantial error? Can a "fundamental" and "substantial" error also be harmless?

¶ 59. Confusion in determining when plain error exists is not surprising. Wisconsin courts long have struggled to define what constitutes a "plain error." As this court acknowledged in *State v. Sonnenberg,* 117 Wis. 2d 159, 344 N.W.2d 95 (1984), defining "plain error" is difficult, if not impossible.[3]

¶ 60. The majority opinion rightfully notes that there is no bright line test for when an error constitutes "plain error" or when reversal is mandated.[4] Rather, courts must weigh the particular facts of each case to determine whether reversal is warranted.[5] To that end, I would follow the analysis I have set forth: Plain error may be found when the court's overall conclusion is that there was error; the error is obvious; and the State fails to meet its burden of proving that the error did not affect substantial rights.

¶ 61. For the reasons set forth, I write separately.

¶ 62. I am authorized to state that Justices ANN WALSH BRADLEY and LOUIS B. BUTLER, JR. join this opinion.

---

[2] Majority op., ¶¶ 20–23.

[3] *State v. Sonnenberg,* 117 Wis. 2d 159, 177, 344 N.W.2d 95 (1984) (citation omitted).

[4] *See* majority op., ¶ 22 (citing *Mayo,* 301 Wis. 2d 642, ¶ 29).

[5] *See* majority op., ¶ 22.