## COURT OF APPEALS
## DECISION
## DATED AND FILED

## April 29, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2020AP1085**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020ME2

**IN COURT OF APPEALS
DISTRICT IV**

IN RE THE COMMITMENT OF J.J.K.:

ROCK COUNTY,

    PETITIONER-RESPONDENT,

  V.

J. J. K.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Rock County: JEFFREY KUGLITSCH, Judge. *Affirmed.*

¶1 NASHOLD, J.[1] J.J.K. appeals an involuntary commitment order entered pursuant to WIS. STAT. § 51.20 and an involuntary medication order entered pursuant to WIS. STAT. § 51.61(1)(g)3. After first addressing the issue of mootness, J.J.K. argues that: (1) the circuit court's admission of, and reliance on, hearsay evidence of dangerousness constitutes plain error; (2) the circuit court failed to find, and the County failed to prove, that J.J.K. was dangerous to himself or others as required by § 51.20(1)(a)2.; and (3) the County did not prove that J.J.K. was substantially incapable of applying an understanding of the advantages and disadvantages of medication to his condition within the meaning of § 51.61(1)(g)4. I affirm.

## BACKGROUND

¶2 On January 6, 2020, Rock County filed a Statement of Emergency Detention, which alleged that J.J.K. evidenced behavior that constituted a substantial probability of physical harm to self or to others. At the time of J.J.K.'s detention in January of 2020, J.J.K. was living outdoors underneath a bridge and refused to live in an apartment that was made available to him through the County. J.J.K. had also recently refused food that was offered by a County employee, stating that he did not "know what [the County employee] put in it."

¶3 On January 15, 2020, a commitment hearing was held, at which the County presented the testimony of psychiatrist Dr. Jeffrey Marcus and psychologist Dr. Kevin Miller, whose reports were received into evidence. In forming their opinions, Drs. Marcus and Miller relied on their mental status

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(d). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

examinations of J.J.K. and on collateral sources, such as police reports, the emergency detention statement, and records from Winnebago Mental Health Institute (Winnebago).

*Dr. Marcus's Testimony and Report*

¶4      Dr. Marcus testified that J.J.K. suffers from a mental illness which he diagnosed as "unspecified psychotic disorder" possibly due to schizophrenia, and that J.J.K. is a proper subject for treatment.  Dr. Marcus explained that he observed paranoid thinking and ideation in J.J.K., which involved J.J.K.'s beliefs that he was being mistreated by Rock County personnel.  Dr. Marcus further testified that J.J.K. had been previously diagnosed with autism spectrum disorder but that J.J.K's psychosis and paranoia would not be caused from autism spectrum disorder.

¶5      Dr. Marcus believed that J.J.K was a danger to himself because, if left to his own devices, J.J.K. would continue to live homeless in cold winter weather, even though the County had arranged for him to live in an apartment. Dr. Marcus believed there were "paranoid underpinnings" to J.J.K.'s refusal to accept housing from the County.  Dr. Marcus acknowledged that he was not aware of any adverse medical conditions that J.J.K. had suffered related to the weather and that J.J.K. was not malnourished.

¶6      With respect to medication, Dr. Marcus testified that he believed medication would have therapeutic value for J.J.K. and that J.J.K. understood the advantages and disadvantages of the medication that Dr. Marcus had explained to him.  Although Dr. Marcus agreed that "psychosocial therapy" was a possible alternative, he stated that "[m]edications, particularly [for] paranoia, would be … by far the type of treatment … modality that you'd want to use."  Dr. Marcus

testified that J.J.K. could not apply his understanding of the medications to his current situation because he "did not see the value in taking" the medication, "did not believe he had a condition for which this medication would offer benefit," and would discontinue the medication if not required to take it. Dr. Marcus testified that J.J.K.'s inability to apply his understanding is "at least in part … related to his mental illness." His report indicates that J.J.K.'s inability is due to mental illness and developmental disability.

*Dr. Miller's Testimony and Report*

¶7      Dr. Miller testified that J.J.K. has a mental illness that Dr. Miller diagnosed as "unspecified schizophrenia spectrum or other psychotic disorder" and that J.J.K is a proper subject for treatment.

¶8      Dr. Miller testified that J.J.K. was a "significant risk of harm" to others. His report states that J.J.K. is dangerous because he evidenced a "substantial probability of physical harm to other subjects as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm."

¶9      In concluding that J.J.K. is a danger to others, Dr. Miller relied in part on a police report showing that J.J.K. had been aggressive toward law enforcement a few weeks before J.J.K. was taken into detention. Dr. Miller's report quoted an excerpt from a police report,[2] stating that on December 13, 2019,

---

[2] This police report, supplemental report #4, is not part of the appellate record.

in response to a citizen complaint, law enforcement made contact with J.J.K., who swore at the officers, eventually picked up a large rock, and "came at the officers in an assaultive manner," resulting in law enforcement attempting to tase J.J.K. When tasing was unsuccessful due to J.J.K.'s winter clothing, law enforcement attempted to use oleoresin capsicum (OC) spray, but when that was also unsuccessful, an officer knocked J.J.K. to the ground. J.J.K. was then arrested for "resisting or obstructing and battery or threats to law enforcement" and held at the Rock County Jail.

¶10 Dr. Miller also relied on reports from Winnebago indicating that after J.J.K. was admitted to Winnebago and refused medication, on January 9, 2020, while being physically restrained and administered involuntary medication, J.J.K. threatened to "fuck someone up" upon being released from restraints. Dr. Miller also stated that during his interview with J.J.K., J.J.K. said that the judge who initially ordered the involuntary medication would "go down" for ordering treatment "illegally," but that J.J.K. refused to elaborate on what he meant by that statement.

¶11 In his report, Dr. Miller stated that, due to J.J.K.'s mental illness, he was substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his condition in order to make an informed choice as to whether to accept or refuse the recommended medication or treatment. Dr. Miller's report further stated that J.J.K. "did not believe he had any issues requiring help."

*J.J.K.'s Testimony*

¶12 J.J.K. testified on his own behalf. When asked how he adapted to the weather, J.J.K. explained that he had clothing such as "bibs," "overalls,"

sweatshirts, stocking caps, and face masks. He testified that "[b]asically I warmed up when I needed to. Put on more clothes—clothing when I needed to. Did what I need to [do] to stay dry and not too wet."

¶13 He testified that he had a representative payee and had received food stamps. J.J.K. confirmed that he had access to food, clean water, and medical care. He stated that he chose not to move into an apartment offered to him by the County because he believed moving into the apartment would delay his ultimate goal—to move back to the state of Oregon to be near his sister and daughter.

¶14 Regarding the threatening comment J.J.K. made at Winnebago, J.J.K. testified, "I was frustrated and I was angry and I was hallucinating a little because of the medication. So I questioned the medication, and at that point, yeah, I made that comment. It was not intentional." He testified that he had not tried to hurt himself or anyone else at Winnebago. He stated that he did not have any intention of harming the judge who presided over his probable cause hearing. J.J.K. acknowledged his mental illness, stating: "I have a mental illness … which I categorize as [something that I am] able to manage and to be able to function in society. I do struggle, I will admit that. We all do struggle sometimes. But I mean I'm able to function. I'm able to survive. I know how."

¶15 The circuit court asked J.J.K. if he would take his medications, and J.J.K. responded:

> That's a tough question because a lot of medications fog up my ability to be able to concentrate and to be able to function. The last time I was on the medication, I was basically one of those people that was a walking zombie. You talked to me, it took me about a few seconds to answer you because I was so, you know, hyped up on meds would be the proper term, that I was just not there.
>
> ….

> And I'm definitely afraid that this is going to happen again. I apologize.

When asked by his counsel to elaborate about why he did not want to take the medications, J.J.K. responded:

> A lot of medications in which I've been prescribed like Ambien, Wellbutrin, you know, Risperdal and, you know, medium to higher doses have made me so foggy I can't -- I can't even do Sudoku, which is what I love to do. So I don't even think enough to even do those....
>
> ….
>
> That's why I refuse to take it, is because I don't like the way it makes me feel.
>
> ….
>
> I'm able to function without it.

*The Circuit Court's Decision*

¶16     The circuit court determined that the County met its burden for involuntary commitment and medication. The court concluded that J.J.K. suffers from a treatable mental illness and that he "creates a danger to himself or to others." Regarding dangerousness to others, the court noted that J.J.K. had behaved aggressively toward law enforcement "to the point where they [found] it necessary to tase and [take] actions of that nature," that J.J.K. had made a threat against the circuit court judge who conducted the probable cause hearing, and that J.J.K. had also threatened Winnebago staff "to fuck them up or whatever it was" while he was being restrained and involuntarily medicated.

¶17     Regarding J.J.K.'s dangerousness to himself, the circuit court noted that J.J.K. had been "living outdoors, sleeping in sleeping bags outside" in the winter and that J.J.K. had "been fortunate it hasn't been extremely cold like it certainly can get in February." The court noted that although "a person has a right

to be homeless if it's of their own choosing," here, the County had offered J.J.K an apartment to "get out of the cold" but that J.J.K. had said it would prevent him from going to Oregon, which did not make sense to the court. The court noted that J.J.K. refused to avail himself of necessary help in the community, and had paranoid delusions, including concerns that there may be wiretaps in the home and that some of the food offered him may have been poisoned. The court stated that J.J.K.'s conduct "goes to the mental illness … he has."

¶18    As to the medication order, the circuit court stated that it had no doubt that "if left to his own devices, [J.J.K.] will not take his medication and he will be in a worse state than he is in court here today." The court credited Dr. Marcus's testimony that, although J.J.K. understood his medications, he was "incapable of applying that understanding of the advantages, disadvantages, and alternatives to his condition in order to make an informed choice as to whether to accept or refuse the recommended treatment." The court ordered that J.J.K. be involuntarily committed for six months and that he be administered involuntary medication.

*Extension of J.J.K.'s Commitment*

¶19    Because the commitment order at issue in this appeal was entered on January 15, 2020, J.J.K.'s commitment would have expired on or about July 15, 2020, months before briefing was completed in this appeal and less than a month before the notice of appeal was filed. However, prior to expiration, the County petitioned for an extension of the commitment (also known as a recommitment), and on July 1, 2020, pursuant to a stipulation, J.J.K. was recommitted for one month and involuntary medication was again imposed, under orders not at issue in this appeal. Following a recommitment hearing, on July 23, 2020, the court

ordered a 12-month extension of J.J.K.'s commitment and again ordered involuntary medication.

¶20    Additional facts will be provided as needed in the discussion section below.

## DISCUSSION

### I. Standard of Review and General Legal Principles

¶21    Review of WIS. STAT. ch. 51 orders for involuntary commitment and for involuntary medication and treatment presents a mixed question of fact and law. This court upholds a circuit court's findings of fact unless they are clearly erroneous. *Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783 (involuntary commitment); *Outagamie Cnty. v. Melanie L.*, 2013 WI 67, ¶¶37-38, 349 Wis. 2d 148, 833 N.W.2d 607 (involuntary medication and treatment). Whether the facts satisfy the statutory requirements for an involuntary commitment or a medication order presents a question of law that this court reviews de novo. *J.W.J.*, 375 Wis. 2d 542, ¶15; *Melanie L.*, 349 Wis. 2d 148, ¶¶38-39.

¶22    For a person to be subject to a WIS. STAT. ch. 51 involuntary commitment, three elements must be fulfilled: the subject individual must be (1) mentally ill; (2) a proper subject for treatment; and (3) dangerous to oneself or to others. *Fond du Lac Cnty. v. Helen E.F.*, 2012 WI 50, ¶20, 340 Wis. 2d 500, 814 N.W.2d 179; WIS. STAT. § 51.20(1)(a)1.-2. Each of these required elements must be proven by clear and convincing evidence. Sec. 51.20(13)(e); *J.W.J.*, 375 Wis. 2d 542, ¶19. The County also bears the burden of proving that an individual

is incompetent to refuse medication by clear and convincing evidence. ***Melanie L.***, 349 Wis. 2d 148, ¶37; *see also* § 51.20(13)(e).

## II. Mootness

¶23     As previously stated, J.J.K.'s six-month commitment was to expire on July 15, 2020. However, on July 1, 2020, pursuant to a stipulation, a one-month extension was ordered, and on July 23, 2020, the court entered a 12-month recommitment order and an involuntary medication order. J.J.K. has appealed the recommitment and that appeal, ***Rock County v. J.J.K.***, No. 2020AP2105, is currently pending.

¶24     The County argues that J.J.K.'s challenge to the January 2020 commitment order is moot. Mootness is a question of law this court reviews de novo. ***Portage Cnty. v. J.W.K.***, 2019 WI 54, ¶10, 386 Wis. 2d 672, 927 N.W.2d 509. "'An issue is moot when its resolution will have no practical effect on the underlying controversy.'" ***Id.***, ¶11 (quoted source omitted).

¶25     In ***Marathon County v. D.K.***, 2020 WI 8, ¶25, 390 Wis. 2d 50, 937 N.W.2d 901, our supreme court held that an appeal of an expired involuntary commitment is not moot when the commitment still subjects the individual to the "lasting collateral consequence of a firearms ban" and a decision in the appellant's favor "would void the firearms ban and therefore have a 'practical effect.'" ***Id.*** Here, it is undisputed that, as a result of the commitment, J.J.K. is subject to a firearms ban and that the firearms ban remains in effect even after expiration of the commitment order. The commitment order states clearly that it "shall remain in effect until lifted by the court" and that "[e]xpiration of the mental commitment proceeding does not terminate [the] restriction." Thus, J.J.K. argues that ***D.K.*** clearly governs and that this appeal is not moot.

¶26 In contrast, the County argues that *D.K.* is inapplicable, and J.J.K.'s appeal is moot, because J.J.K.'s commitment was subsequently extended and he is now subject to a firearms ban under the recommitment order. In addition, the County asserts that J.J.K. is also banned from possessing firearms by a domestic violence restraining order under WIS. STAT. § 813.12, which the County contends is in effect until May 24, 2022. Thus, according to the County, a reversal of the commitment order in this case would therefore have no practical effect on D.K.'s ability to possess a firearm. Instead of being governed by *D.K.*, the County argues that this case is governed by *J.W.K.*, in which the court determined that J.W.K.'s challenge to a 2016 recommitment order was moot because the 2016 order expired after the court again extended J.W.K.'s commitment in 2017 under a separate order. *J.W.K.*, 386 Wis. 2d 672, ¶1. The County's arguments are unpersuasive.

¶27 First, *J.W.K.* was decided prior to *D.K.* and the *J.W.K.* court specifically explained that its decision was "limited to situations where, as here, no collateral implications to the commitment order are raised." *Id.*, ¶28 n.11. The court suggested that an appeal of an expired commitment order may not be moot if the committed individual continued to be affected by collateral consequences of the order, noting that the firearms ban and liability for the costs of care might be potential collateral consequences of commitments. *Id.* In contrast, here, J.J.K. specifically raises the issue of collateral consequences attendant to his commitment, including the firearms ban.

¶28 Moreover, I reject the County's argument that this appeal is moot because a firearms ban was also imposed in the subsequent recommitment order and therefore a reversal of the commitment order in this appeal will have no practical effect on J.J.K.'s ability to possess a firearm. As previously stated, J.J.K. has appealed the recommitment order and that appeal is pending. I cannot

11

conclusively determine that reversal of the commitment order in this appeal would have no practical effect because it has not yet been established whether, in the other appeal, the recommitment order—which also includes a firearms ban—will be reversed or affirmed.

¶29    I also reject the County's related argument that this case is moot because J.J.K. is banned from owning a firearm pursuant to a domestic violence restraining order.  Even assuming that a separate firearms restriction is in place until May 24, 2022 as the County asserts, once that order expires, J.J.K. would still be restricted from possessing a firearm under the commitment order in this case.  Thus, contrary to the County's position, a reversal of the commitment order in this case would in fact have a "practical effect."  *See **J.W.K.***, 386 Wis. 2d 672, ¶11.

¶30    Accordingly, I conclude that the appeal of the commitment order is not moot.[3]

### III.  Hearsay

¶31    J.J.K. argues that the circuit court relied on impermissible hearsay in determining that J.J.K. is dangerous to others.  Specifically, J.J.K. challenges Dr. Miller's report and testimony describing the December 13, 2019 incident in

---

[3] Given my determination that this case is not moot because of the collateral consequence of the firearms ban, I need not consider J.J.K.'s other ground for arguing that the case is not moot, namely, that he may be liable for the cost of care while committed.  *See **Barrows v. American Fam. Ins. Co.***, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) ("An appellate court need not address every issue raised by the parties when one issue is dispositive.").

I also note that the circuit court's July 1, 2020 order recommitting J.J.K. for one month pursuant to the parties' stipulation also includes a firearms ban.  However, because the parties do not make any arguments that rely on this order, I do not consider its possible consequences here.

12

which J.J.K. acted aggressively toward officers, resulting in officers attempting to tase and use OC spray on J.J.K., and the January 9, 2020 incident in which J.J.K., while being physically restrained and forcibly medicated, stated that he would "fuck someone up" upon being released from restraints. Dr. Miller did not witness either of these two events but instead learned of them through collateral sources, namely, a police report and Winnebago records, respectively.

¶32    Significantly, J.J.K. did not object to Dr. Miller's testimony or report describing these incidents. Nevertheless, J.J.K. argues that the circuit court's reliance on this hearsay evidence constituted "plain error" and that the error was not harmless. J.J.K. notes the court's following references to these incidents:

- "There [were] concerns [regarding] his conduct from law enforcement to the point where they needed to tase[.]"

- "But, again, in engaging with law enforcement to the point where they felt it necessary to tase[.]"

- "Dr. Miller talked about the threats on the unit …. So we're looking at a different level of dangerousness there. And I understand, he was forcibly restrained and being involuntarily medicated and he acted out and he was making statements whether he's going to fuck them up or whatever it was."

¶33    J.J.K. acknowledges that under WIS. STAT. § 907.03 an expert may rely on hearsay in forming an opinion. However, J.J.K. cites precedent concluding that the underlying hearsay remains inadmissible. *See* ***S.Y. v. Eau Claire Cnty.***, 156 Wis. 2d 317, 327-28, 457 N.W.2d 326 (Ct. App. 1990) ("While experts may rely on inadmissible evidence in forming opinions, [WIS. STAT. §] 907.03, the

underlying evidence is still inadmissible."); ***State v. Coogan***, 154 Wis. 2d 387, 399, 453 N.W.2d 186 (Ct. App. 1990) (expert may not act as a conduit for inadmissible evidence); ***State v. Williams***, 2002 WI 58, ¶19, 253 Wis. 2d 99, 644 N.W.2d 919 (expert cannot act as a conduit for the opinion of another).

¶34 However, the authority upon which J.J.K. relies is unavailing because it does not address the plain error doctrine. I also note that, in contrast to this case, in ***S.Y.*** and ***Williams***, the party opposing the evidence made a timely objection. ***S.Y.***, 156 Wis. 2d at 327; ***Williams***, 253 Wis. 2d 99, ¶5. And the ***Coogan*** court addresses the "conduit for inadmissible evidence" issue in the context of affirming the denial of a motion for a new trial. ***Coogan***, 154 Wis. 2d at 394-401. As explained below, I conclude that J.J.K. has forfeited his challenge to this evidence by failing to object, and that J.J.K. has not demonstrated that the plain error doctrine applies.

¶35 Typically, "failure to object constitutes a forfeiture of the right on appellate review." ***State v. Ndina***, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612. "The purpose of the forfeiture rule is to enable the circuit court to avoid or correct any error as it comes up, with minimal disruption of the judicial process and maximum efficiency." ***State v. Counihan***, 2020 WI 12, ¶26, 390 Wis. 2d 172, 938 N.W.2d 530. "Such a practice encourages timely objections and obviates the need for appeal." ***Id.*** It additionally "prevents attorneys from 'sandbagging' opposing counsel by failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal." ***Id.***, ¶27 (quoted source omitted).

¶36 However, WIS. STAT. § 901.03(4) recognizes the plain error doctrine. "The plain error doctrine allows appellate courts to review errors that

were otherwise [forfeited] by a party's failure to object." *State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. "Plain error is error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." *Id.* (quoted source and internal quotation marks omitted). The error, however, must be "obvious and substantial." *Id.* "Courts should use the plain error doctrine sparingly." *Id.* The party seeking application of the plain error doctrine "bears the burden in the first instance to 'show[ ] that the unobjected to error is fundamental, obvious, and substantial.'" *State v. Nelson*, 2021 WI App 2, ¶46, 395 Wis. 2d 585, 954 N.W.2d 11 (quoting *Jorgensen*, 310 Wis. 2d 138, ¶23).

¶37 In the instant case, J.J.K. has failed to meet his burden of establishing that any reliance on the hearsay information constitutes plain error that would allow J.J.K. to challenge the evidence despite his failure to object. J.J.K. has failed to cite any authority in which an appellate court has applied a plain error analysis in similar circumstances. A high bar rightfully exists for establishing plain error and J.J.K. has not met it here, nor has he shown why this is one of the rare instances where this court should abandon the forfeiture rule and thereby deprive the circuit court and the County of the opportunity to respond to an objection.

¶38 I also note that, with respect to J.J.K.'s statement that he would "fuck someone up," J.J.K. testified to having made this statement, although he further testified that he did so only because he was frustrated, angry, and "hallucinating a little bit" because of the involuntary medication, and that he never hurt anyone at Winnebago. J.J.K. was also asked by his counsel if he "had any intentions of harming the judge who presided over your probable cause hearing"

and responded that he did not. That J.J.K. himself verified aspects of these same incidents is further reason to reject an application of the plain error doctrine.

¶39 In sum, by failing to object to Dr. Miller's description of these incidents described above, J.J.K. has forfeited any challenge to this evidence and the circuit court was permitted to rely on the evidence in reaching its conclusions.

## IV. Dangerousness

¶40 As previously stated, in an involuntary commitment proceeding, the County has the burden of showing by clear and convincing evidence that the individual is dangerous under one of the five specific standards of dangerousness set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. *See J.W.K.*, 386 Wis. 2d 672, ¶17; § 51.20(1)(a), (13)(e). Each of these dangerousness standards requires evidence of recent acts or omissions demonstrating that the individual is a danger to him or herself or to others. *J.W.K.*, 386 Wis. 2d 672, ¶17; § 51.20(1)(a)2.a.-e.

¶41 J.J.K. first argues that the circuit court failed to identify the standard of dangerousness in WIS. STAT. § 51.20(1)(a)2. under which J.J.K. was committed. However, even assuming this assertion is true, J.J.K. does not provide authority demonstrating that this omission requires reversal of the commitment order. J.J.K. first quotes *D.K.*, 390 Wis. 2d 50, ¶55, in which the court observed that "the circuit court could have made more detailed and thorough factual findings and clarified its legal conclusions." However, J.J.K does not argue, and *D.K.* does not support, that a circuit court's failure to specifically identify a statutory standard of dangerousness results in reversal.

¶42 J.J.K. also relies on our supreme court's holding in *Langlade County v. D.J.W.*, 2020 WI 41, 391 Wis. 2d 231, 942 N.W.2d 277, requiring that

circuit courts in recommitment proceedings make specific factual findings regarding dangerousness. *See **D.J.W.***, 391 Wis. 2d. 231, ¶40 ("[*G*]*oing forward* circuit courts in recommitment proceedings are to make specific factual findings with reference to the subdivision paragraph of [WIS. STAT. §] 51.20(1)(a)2. on which the recommitment is based.") (emphasis added). J.J.K. acknowledges that ***D.J.W.*** addresses recommitment proceedings, but argues that the requirement should also apply to initial commitment proceedings. However, even accepting the premise that the ***D.J.W.*** directive applies to initial commitment proceedings, this would not assist J.J.K. As we have previously determined, ***D.J.W.***'s directive is prospective only and "is inapplicable" where, as here, the commitment order predates ***D.J.W.***; thus, failure to make the required findings with reference to § 51.20(1)(a)2. "cannot compel reversal." ***Winnebago Cnty. v. S.H.***, 2020 WI App 46, ¶14, 393 Wis. 2d 511, 947 N.W.2d 761.

¶43 J.J.K. also argues that the County failed to prove that J.J.K. was dangerous under any of the standards set forth in WIS. STAT. § 51.20(1)(a)2.a.-e. I disagree. As explained below, I conclude that the County met its burden of showing that J.J.K. was dangerous to others under § 51.20(1)(a)2.b. Under this provision, an individual is dangerous if he or she:

> [e]vidences a substantial probability of physical harm to other individuals as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm.

Sec. 51.20(1)(a)2.b.

¶44 The circuit court concluded that the County met its burden by "clear and convincing" evidence that J.J.K. "creates a danger to himself or to others."[4] In concluding that J.J.K. was dangerous to others, the court relied on J.J.K.'s conduct toward law enforcement a few weeks before his detention "to the point where they felt it necessary to tase and [take] actions of that nature." The court also relied on J.J.K.'s threats to Winnebago staff on January 9, 2020, that he would "fuck someone up" when he was released from restraints, and J.J.K.'s threats involving the judge who presided over J.J.K.'s probable cause hearing.

¶45 The evidence also included Dr. Miller's opinion in his report that J.J.K. is dangerous because he evidences a "substantial probability of physical harm to other subjects as manifested by evidence of recent homicidal or other violent behavior, or by evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." This conclusion tracks the language in WIS. STAT. § 51.20(1)(a)2.b. Dr. Miller likewise testified that J.J.K. was a "significant risk of harm" to others. In addition, Drs. Miller and Marcus both note in their reports that J.J.K.'s mother has a restraining order against J.J.K.

¶46 Based on the foregoing, J.J.K. "[e]vidence[d] a substantial probability of physical harm to other individuals as manifested by evidence of

---

[4] In concluding that J.J.K. was a danger to himself, the circuit court relied primarily on evidence that J.J.K. was living outside in the winter even though the County had provided him with an apartment. The parties dispute whether the evidence before the circuit court in this case relating to J.J.K.'s living outdoors in the winter constituted sufficient evidence of dangerousness to oneself under WIS. STAT. § 51.20(1)(a)2. However, I need not address this issue in light of my determination that the record shows by clear and convincing evidence that J.J.K. presents a danger to others under § 51.20(1)(a)2.b. *See Barrows v. American Fam. Ins. Co.*, 2014 WI App 11, ¶9, 352 Wis. 2d 436, 842 N.W.2d 508 (2013) (appellate courts need not address every issue raised by parties when one issue dispositive).

recent ... violent behavior" under WIS. STAT. § 51.20(1)(a)2.b., in particular, through J.J.K.'s aggressive acts toward police. In addition, J.J.K.'s conduct toward police, his threat toward the judge, and his threats toward Winnebago staff support the conclusion that "others [were] placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm." Sec. 51.20(1)(a)2.b. As this court observed in *R.J. v. Winnebago County*, 146 Wis. 2d 516, 523, 431 N.W.2d 708 (Ct. App. 1988), an objective test applies to a determination of whether there exists a "reasonable fear of violent behavior" under § 51.20(1)(a)2.b.: "a showing can be made that others are placed in a fearsome position by a disturbed person's actions even if the person placed in that position has no subjective awareness of it." *See also R.J.*, 146 Wis. 2d at 522 (it would "defeat the statute's purpose" and "lead to an absurd result" to interpret the statute to "focus upon the subjective feelings of the threatened individual" and the "effects of the acts" instead of "the objective acts of the disturbed person.").

¶47 Accordingly, I conclude that the record establishes by clear and convincing evidence that J.J.K. was dangerous to others under WIS. STAT. § 51.20(1)(a)2.b.

## V. Involuntary Medication Order

¶48 J.J.K. argues that the County failed to prove that he was incompetent to refuse treatment under WIS. STAT. § 51.20(13)(e).

¶49 "[A] competent individual has a protected Fourteenth Amendment liberty interest in refusing unwanted medical treatment." *Melanie L.*, 349 Wis. 2d 148, ¶89 (quoted source omitted). An individual is presumed competent to refuse medication or treatment. *Id.* The County bears the burden of proving that an

individual is incompetent to refuse medication by clear and convincing evidence. *Id.* at ¶37; WIS. STAT. § 51.20(13)(e).

¶50　The competency standards in WIS. STAT. § 51.61(1)(g)4. provide:

> [A]n individual is not competent to refuse medication or treatment if, because of mental illness, developmental disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:
>
> 　a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.
>
> 　b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

¶51　There is no dispute in this case that Drs. Marcus and Miller explained, and that J.J.K. understood, the advantages and disadvantages of medication. Thus, competency standard 4.a. is not at issue here. Instead, J.J.K. argues that the County failed to meet its burden under competency standard 4.b. because the County failed to prove by clear and convincing evidence that J.J.K. is substantially incapable of applying an understanding of the advantages, disadvantages, and alternatives of medication in order to make an informed choice as to whether to accept or refused medication or treatment. I disagree.

¶52　The circuit court determined that although J.J.K. "understand[s] his medications," he was "incapable of applying that understanding of the advantages, disadvantages, and alternatives to his condition in order to make an informed choice as to whether to accept or refuse the recommended treatment." The court's

medication order likewise states that, due to mental illness,[5] J.J.K. is "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her condition in order to make an informed choice as to whether to accept or refuse psychotropic medications." The court stated that it had no doubt that if "left to his own devices, [J.J.K.] will not take his medication and he will be in a worse state than he is in court here today." The court's conclusions are supported by the record.

¶53     Both Drs. Miller and Marcus stated in their reports that J.J.K. is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his condition in order to make an informed choice as to whether to accept or refuse the recommended medication or treatment. Dr. Marcus's report explained the basis for this conclusion:

> [J.J.K.'s] insight into the presence and nature of his mental illness appeared grossly impaired. He essentially denied having a condition for which his current medication (Risperdal) would be necessary and expressed a desire to discontinue the medication once he is discharged from the hospital. He did not appear to understand the risks associated with stopping his treatment.

Dr. Marcus testified similarly, stating that although J.J.K. understood his medications, "[w]here he had difficulty was applying any of that understanding to his own condition. He further testified that, due to J.J.K.'s mental illness, "[J.J.K.] did not see the value in taking this medication. He did not believe he had a

---

[5] The circuit court's order actually indicates that J.J.K.'s inability is due to both "mental illness" and "developmental disability," i.e., autism spectrum disorder. The court did not make any oral statements regarding a developmental disability, and the parties do not address this issue. Therefore, this opinion likewise does not address this topic.

condition for which this medication would offer benefit, and it was pretty clear that he would want to discontinue this medication if not in a hospital."

¶54    Likewise, when asked if he would voluntarily take his medication, J.J.K. responded that it was "a tough question," explaining, "[A] lot of medications fog up my ability to be able to concentrate and to be able to function. The last time I was on the medication, I was basically one of those people that was a walking zombie." He further testified:

> A lot of medications in which I've been prescribed like Ambien, Wellbutrin, you know, Risperdal and, you know, medium to higher doses have made me so foggy I can't -- I can't even do Sudoku, which is what I love to do. So I don't even think enough to even do those.
>
> ….
>
> *That's why I refuse to take it*, is because I don't like the way it makes me feel.
>
> ….
>
> I'm able to function without it.

(Emphasis added.)

¶55    Dr. Miller similarly reported that J.J.K. had informed him that "he does not need any mental health care." His report further stated that, due to J.J.K.'s mental illness, J.J.K. was substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his condition in order to make an informed choice as to whether to accept or refuse the recommended medication or treatment.

¶56    Our supreme court has recognized that "[i]t may be true that if a person cannot recognize that he or she has a mental illness, logically the person cannot establish a connection between his or her expressed understanding of the

22

benefits and risks of medication and the person's own illness." *Melanie L.*, 349 Wis. 2d 148, ¶72. Further, "[a] person's history of noncompliance in taking prescribed medication is clearly relevant" to this issue, although "it is not determinative if the person can reasonably explain the reason for the noncompliance." *Id.*, ¶75. Thus, in determining that J.J.K. was substantially incapable of applying the requisite understanding, the circuit court could properly consider J.J.K.'s noncompliance and his belief that he did not have a mental illness for which medication was needed.

¶57 I also note that, contrary to J.J.K.'s statements that he does not have a mental illness for which medication would help, Dr. Marcus testified that J.J.K.'s symptoms "are typically amenable to psychiatric interventions, antipsychotic medications" and that J.J.K. had shown improvement while taking medication. Dr. Marcus also testified:

> [J.J.K.] has shown an initial response to treatment. When I spoke to staff at Winnebago, it was apparent that his symptoms and his functioning began to improve. He was on a very low dose of medication called Risperdal and that dosage had just been increased and I think they were beginning to see a response to that. There was also an indication that he may have had a positive response to that in the past. These are all clues that the condition he has are -- would be treatable.

¶58 Based on the record, I conclude that the County proved by clear and convincing evidence that J.J.K. was incompetent to refuse treatment under competency standard WIS. STAT. § 51.61(1)(g)4.b.

**CONCLUSION**

¶59 For the reasons stated above, the circuit court's involuntary commitment and medication orders are affirmed.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.