COURT OF APPEALS
DECISION
DATED AND FILED

July 18, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2207-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF3388**

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ALVIN JAMES JEMISON, JR.,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed.*

Before Brash, C.J., Dugan and White, JJ.

¶1 BRASH, C.J. Alvin James Jemison, Jr. appeals from a judgment convicting him of second-degree sexual assault of an unconscious person. He challenges that conviction on three grounds—namely, that the State failed to establish that he had sexual intercourse with the victim; that the circuit court erred

in permitting the State to introduce certain other-acts evidence of prior convictions; and that the circuit court also erred in denying, without a hearing, his postconviction claim that he received ineffective assistance of counsel at trial. For the reasons set forth below, we disagree with Jemison on all three issues and so affirm the judgment of conviction and the order denying postconviction relief.

## BACKGROUND

¶2 On July 26, 2016, Teresa[1] was out celebrating with family and friends. After that, she returned home and watched television until she fell asleep. Teresa awoke feeling pain, as if "someone had their penis in her anus." She also felt that her underwear had been pulled down.

¶3 Teresa got out of bed, ran to the bathroom, and saw that Jemison, described as a "family friend," was in her bed. She told the police that she never gave Jemison permission to have sex with her and never invited him into her bedroom.

¶4 The police also interviewed Teresa's mother, Alice,[2] who stated that when she had arrived home, she noticed that the pole to the blinds in the kitchen was damaged, as if someone had attempted to get in through the window. Alice also confirmed that she knew Jemison because in 2004, he was involved in a

---

[1] Pursuant to WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym to identify the victim throughout this decision.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] Again, we use a pseudonym in reference to the mother of the victim.

sexual assault of another family member, but that the family had forgiven him for that conduct.

¶5      The State charged Jemison with second-degree sexual assault as a repeater–serious sex crimes, and also pursued a charge of burglary (home invasion).

¶6      Prior to the trial, the State sought to admit five instances of other-acts evidence—two of those resulting in convictions and three as uncharged allegations. Of the two that resulted in convictions, the victims were family friends of Jemison, both were sleeping in bed, and both woke up as Jemison was sexually assaulting them.

¶7      In support of the admission of these other-acts, the State argued that the evidence demonstrates "proof of motive, intent, absence of mistake or accident, and context." Importantly, counsel for Jemison did not object to the admission of the two convictions but did oppose the allegations evidence, contending that it was too remote in time from the present alleged conduct and thus unduly prejudicial.

¶8      The circuit court ruled that the convictions were admissible in trial, as were two of the three allegations. Even so, the State introduced only Jemison's two prior convictions by reading portions of the complaints in those cases; it did not attempt to present evidence of any of the allegations evidence.

¶9      The first certified record of conviction was premised on a 1993 case in which Jemison pled guilty to second-degree sexual assault of a child. In that matter, the juvenile victim was asleep and woke up to find Jemison, who was a

family friend, cupping and massaging her breast. The juvenile victim screamed for her mother, who came into the bedroom.

¶10    The second certified record of conviction was based on a 2003 case in which Jemison pled guilty to second-degree sexual assault of an unconscious victim. In that matter, the victim was asleep and woke to find Jemison, a family friend, with his hand inside her pajamas, rubbing her vagina. The victim moved around in an attempt to get him to stop, and when she stopped moving, Jemison began touching her buttocks over the blanket.

¶11    During opening argument, defense counsel told the jury, "there is no dispute here that the victim and Mr. Jemison had sex." In fact, Jemison's primary defense throughout the trial was that the sex to which he admitted was consensual. As the first witness, Teresa testified that she had known Jemison as a family friend for almost twenty years and that, on the date of the crime, she went to her aunt's home, where Jemison showed up. She stated that she had some drinks there and watched a show—and that, when she needed to get home, Jemison drove her. As he dropped her off, both of them did a "shot," and Teresa then went inside; she testified that she never invited Jemison into the home.

¶12    Once inside, Teresa cooked dinner, went to her bedroom to watch television and listen to the radio and then fell asleep. She woke up that night by "[a] forced feeling in my anal." She further testified that Jemison was "trying to put his stuff inside of my butt" and that he "was almost in there, but not quite in my anal." Teresa observed that it was Jemison, "lunged him" with her elbow, jumped out of bed, and ran to the bathroom. Jemison then ran out of Teresa's bedroom.

¶13     When she was in the bathroom, Teresa "felt [a clear] liquid down [her] legs." She ran into her stepfather's room and told him that she believed she had just been raped by Jemison. Teresa's stepfather, George Hall, also testified at the trial, recounting that on the evening of July 26, 2016, he woke up to Teresa "knocking on my door, and it was like a real forceful knock. Like a bang." According to Hall, Teresa was "crouching real tight" and "crying hysterical[.]" Confirming Teresa's account, Hall stated that Teresa told him that Jemison "tried to rape her."

¶14     Hall then drove Teresa to the hospital, where a nurse performed a SANE exam.[3] That nurse, Allison Lopez, testified that she met with Teresa on the morning of July 27, 2016, during which Teresa told her that she woke up "between one and two a.m. realizing that she was being assaulted."

¶15     According to Nurse Lopez's report, from which she testified, Teresa also told her that "I woke up and he was trying to push it in there. [Teresa] states that her anus was being penetrated by the assailant's penis." According to Lopez, Teresa was "tearful, sobbing, trembling when discussing the events that occurred"; Lopez further testified that Teresa was "complaining of pain to her anus."

¶16     Detective Jonathan Mejias-Rivera testified at trial that police had retrieved a buccal standard from Jemison; that standard, as well as the SANE kit collected by Nurse Lopez, was sent to the Wisconsin State Crime Laboratory for testing. The analyst who tested the samples, Emily Schmitt, testified that to a

---

[3] In a "Sexual Assault Nurse Examiner" (SANE) procedure, a registered nurse with specialized training in sexual assault situations performs appropriate examinations and collects forensic evidence.

reasonable degree of scientific certainty, Jemison was the source of the semen that was collected from Teresa.

¶17    In connection with its introduction of the other-acts evidence, the State introduced the certified criminal complaints against Jemison from 1993 and 2003, and read portions of them to the jury.  In its instructions to the jury, the circuit court explained that the evidence regarding Jemison's guilty pleas to second-degree sexual assault of a child and to second-degree sexual assault of an unconscious victim could be considered "only on the issue of identity, that is, whether the prior conduct of [Jemison] is so similar to the offense charged that it tends to identify [Jemison] as one who committed the offense charged, opportunity that is whether [Jemison] had the opportunity to commit the offense charged."  The circuit court also instructed the jury that it could not consider the other-acts evidence "to conclude that [Jemison] has certain character or certain character traits that [Jemison] acted in conformity with that trait or character with respect to the offense charged in this case."

¶18    After brief deliberation, the jury found Jemison guilty of both counts in the amended information, and the circuit court subsequently sentenced Jemison to life in prison without the possibility of release to extended supervision.

¶19    Jemison then sought postconviction relief in the form of a new trial. Specifically, he claimed that the circuit court committed plain error in allowing the State to introduce the other-acts evidence of his two prior sexual assault convictions.  He also alleged that his trial counsel was ineffective for not objecting to the introduction of the other-acts evidence.  Jemison asked for an evidentiary hearing on his motion should a new trial not be granted.

6

¶20    After briefing by the parties, the court denied that motion without conducting an evidentiary hearing. It concluded that the other-acts evidence was appropriately admitted into evidence since they "were clearly similar to the current offense in terms of their *modus operandi*," as all of the offenses "involved [Jemison] sexually taking advantage of sleeping victims, and therefore, the other[-]acts were relevant to the issue of identity." The court also determined that Jemison failed to establish that "the probative value of the other[-]acts evidence was substantially outweighed by the danger of unfair prejudice"—and that "any danger of unfair prejudice was minimized or eliminated by the court's cautionary instruction."

¶21    In response to the plain-error argument of the defense, the court found that "the primary purpose of the complaints created for separate criminal actions was not as an out-of-court substitute for trial testimony in this case." It also concluded that Jemison's "right to confrontation as to the complaints was waived by his guilty pleas in those cases" and that "evidence of the convictions presented in conjunction with the complaints was proper other[-]acts evidence[.]" The court further observed that, "as a practical matter, even if presentation of these specific documents was objectionable, [Jemison] admitted to this conduct by his guilty pleas."

¶22    Beyond this, the court noted that, because the State could have provided evidence of Jemison's other acts "by a variety of other means, the admission of these documents was harmless. The manner of the presentation of [Jemison's] prior acts of sexual assault did not affect the outcome of the trial."

¶23    Finally, as to the claim of ineffective assistance of counsel, the court determined that because the evidence of the other acts was properly admitted,

7

Jemison "cannot demonstrate that he was prejudiced as the court would have overruled an objection from trial counsel and the State could have presented evidence of the conduct to which the defendant pled guilty to by other means." As noted above, Jemison appeals on three bases—namely, that the State failed to establish that he had sexual intercourse with the alleged victim; that the trial judge erred in allowing the State to present other-acts evidence in the nature of the two prior convictions; and that he also erred in denying, absent an evidentiary hearing, Jemison's postconviction claim of ineffective assistance of counsel.

## DISCUSSION

### 1. Sufficiency of the evidence of "sexual intercourse"

¶24 In principal factual support of his argument about the insufficiency of the evidence of actual "sexual intercourse," Jemison appears to seize on the words used by Teresa in describing the event—namely, that Jemison was "trying" to put his penis in her anus; that it was "almost in [her anus]" but "not quite in [her] anal." Invoking the definitional language of the relevant WIS JI—CRIMINAL 1200B, Jemison maintains that to support a conviction for sexual intercourse, Jemison's penis must have actually entered Teresa's anus and that the jury in this case must have speculated about the meaning of Teresa's testimony and, most important, about what actually happened.

¶25 "When a defendant challenges a verdict based on sufficiency of the evidence, [appellate courts] give deference to the jury's determination and view the evidence in the light most favorable to the State." *State v. Coughlin*, 2022 WI 43, ¶24, 402 Wis. 2d 107, 975 N.W.2d 179. "If more than one inference can be drawn from the evidence, [the appellate court] must adopt the inference that supports the conviction." *Id.* Stated differently, this court "will not substitute [its]

own judgment for that of the jury unless the evidence is so lacking in probative value and force that no reasonable jury could have concluded, beyond a reasonable doubt, that the defendant was guilty." *Id.*

¶26 Here, Jemison expressly conceded at trial that he had sex with Teresa. Beyond the fact that his principal defense was that the sex was consensual, defense counsel told the jury precisely that in the opening statement. Moreover, as described above, the language of Teresa's graphic testimony—that is, that she woke up to a "forced feeling in my anal" and that Jemison was "trying to put his stuff inside of my butt"—provided the jury with a factually sufficient basis upon which to conclude that Jemison had sexual intercourse with Teresa.[4]

¶27 That factual conclusion also finds support in the related testimony of the SANE nurse, who, among other things, recorded Teresa's account that her anus "was being penetrated by the assailant's penis." In combination with the scientific evidence from the Wisconsin State Crime Laboratory analyst that Jemison was the source of the semen that was collected from Teresa, Jemison is unable to carry his "heavy burden to show [that] the evidence could not reasonably have supported a finding of guilt." *State v. Beamon*, 2013 WI 47, ¶21, 347 Wis. 2d 559, 830 N.W.2d 681.

¶28 For these reasons, we reject Jemison's argument that the abundant evidence presented by the State at trial was insufficient to prove "sexual intercourse" beyond a reasonable doubt.

---

[4] It should be noted that the circuit court, in properly instructing the jury on the elements of second-degree sexual assault, also noted that "any intrusion however slight by any part of the person's body or of any object, into the genital or anal opening of another" could qualify as "sexual intercourse."

## 2. The admission of other-acts evidence at trial

¶29 Because his counsel did not object to the admission of the other-acts evidence, Jemison argues that the circuit court committed plain error in allowing the presentation to the jury of his prior sexual assault convictions in 1993 and 2003. Among other things, he contends that the other acts were too remote and dissimilar to justify their introduction; that they were inappropriately admitted to prove "identity"; and that, in any case, the State should not have been allowed to read to the jury portions of the criminal complaints associated with Jemison's prior convictions.

¶30 At the outset, we reaffirm the long standing proposition that plain error is an error that is so fundamental that a new trial or other type of relief must be granted despite the lack of an objection during trial. *See State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77. To support relief, the error must also be obvious and substantial; it is only if the defendant "shows that the unobjected to error is fundamental, obvious, and substantial [that] the burden then shifts to the State to show the error was harmless." *Id.*

¶31 Beyond this, we review the "circuit court's admission of other-acts evidence for an erroneous exercise of discretion." *State v. Griffin*, 2019 WI App 49, ¶19, 388 Wis. 2d. 581, 933 N.W.2d 681. In that undertaking, we also invoke the traditional, three-step analytical framework established in *State v. Sullivan*, 216 Wis. 2d 768, 771-72, 783, 576 N.W.2d 30 (1998). First, the evidence must be offered for an admissible purpose under Wis. Stat. § 904.04(2)(a), such as to establish motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Sullivan*, 216 Wis. 2d at 772.

¶32   Although mode or method of operation ("modus operandi") is not expressly listed in WIS. STAT. § 904.04(2), it is generally held to be among the factors "that tends to establish the identity of the perpetrator." *State v. Hall*, 103 Wis. 2d 125, 139 & n.6, 307 N.W. 2d 289 (1981) (quoting *Francis v. State*, 86 Wis. 2d 554, 560, 273 N.W.2d 310 (1979)). Circuit court judges are also permitted to admit some types of other-acts evidence to show the context of the crime, to provide a complete explanation of the case, and to establish the credibility of victims and witnesses. *State v. Hunt*, 2003 WI 81, ¶¶58-59, 263 Wis. 2d 1, 666 N.W.2d 771.

¶33   The second prong of the admissibility test is relevance—that is, that the proffered evidence must be both of consequence to the determination of the action and also tend "to make the consequential fact or proposition more probable or less probable than it would be without the evidence." *Sullivan*, 216 Wis. 2d at 772. Importantly, courts evaluate the probative value of that evidence in part based on the similarity of the charged offense to the other acts in terms of nearness of time, place, and circumstances. *State v. Hammer*, 2000 WI 92, ¶31, 236 Wis. 2d 686, 613 N.W. 2d 629.

¶34   When the party seeking the admission of the other-acts evidence establishes these two prongs by a preponderance of the evidence, the burden shifts to the opposing party for the third prong of the test. *State v. Marinez*, 2011 WI 12, ¶19, 331 Wis. 2d 568, 797 N.W.2d 399. This standard requires that the court weigh whether the probative value of the evidence is substantially outweighed by the risk of unfair prejudice or confusion to the jury under WIS. STAT. § 904.03.

¶35   WISCONSIN STAT. § 904.04 establishes the foundational evidentiary requirements that the parties are obliged to satisfy if other-acts evidence is to be

11

introduced. Section 904.04(2) of the statute "favors admissibility in the sense that it mandates the exclusion of other crimes evidence in only one instance: when it is offered to prove the propensity of the defendant to commit similar crimes." *State v. Speer*, 176 Wis. 2d 1101, 1115, 501 N.W.2d 429 (1993).

¶36 Additionally, when the charges in a criminal matter involve a "serious sex offense," the so-called "greater latitude" rule generally applies. Codified at WIS. STAT. § 904.04(2)(b)1., the rule establishes the "principle that in sexual assault cases … courts permit a 'greater latitude of proof as to other like occurrences.'" *State v. Davidson*, 2000 WI 91, ¶36, 236 Wis. 2d 537, 613 N.W.2d 606 (citations omitted).

¶37 The complete record before the trial and the postconviction courts in this case is modestly inconsistent in identifying with particularity the precise purpose or purposes for which the other-acts evidence was invoked and offered. Before the circuit court, the State apparently sought the admission of that evidence as proof of motive, intention, absence of mistake or accident, and context.

¶38 The postconviction court appears to have focused its attention somewhat more narrowly on the notion of "modus operandi"—that is, that the prior convictions were clearly similar to the current offense in their method or mode of operation and thus relevant to the jury's consideration of "identity." We conclude, based upon the evidence presented at trial, that *all* of the identified other-acts categories provide bases for admission under WIS. STAT. § 904.04(2)(a), as the State proposed and argued.

¶39 Similarly, we hold that the prior convictions were relevant, as mandated by the second *Sullivan* touchstone. It is well established that evidence is relevant if it "relates to a fact or proposition that is of consequence to the

determination of the action [and] has a tendency to make a consequential fact more probable or less probable than it would be without the evidence." *State v. Hurley*, 2015 WI 35, ¶77, 361 Wis. 2d 529, 861 N.W.2d 174. Among other factual issues, motive and intent, especially in cases involving sexual assault, are highly consequential to the determination of guilt or innocence, and the other-acts evidence here unmistakably goes to assessments of Jemison's intentional or volitional acts.

¶40 The second component of the relevancy analysis—namely, whether the evidence offered tends to make a consequential fact more or less likely— rightly focuses on probative value. *Id.*, ¶79. The instructional guidelines set forth in *Hurley* are appropriately invoked here—including that the "measure of probative value in assessing relevance is the similarity between the charged offense and the other act…. The greater the similarity, complexity and distinctiveness of the events, the stronger is the case for admission of the other[-]acts evidence." *Id.*

¶41 In this case, the similarities between the behaviors upon which the prior convictions were premised and the conduct alleged in this case are compelling. In each, Jemison's victims were sleeping in their own beds and were family friends who he sexually assaulted. Even so, Jemison argues that the other-acts evidence was too remote in time, since one of the prior convictions was based on an event some twenty-three years before the present conduct, and the other occurred almost thirteen years prior; he also describes the behaviors as too

dissimilar since the victims were of significantly different ages,[5] and the sexual acts themselves involved different body parts.

¶42 We disagree that these differences compel a result contrary to that which the trial judge and the postconviction court reached. Even when the evidence is somewhat remote in time, that remoteness may be balanced and even overcome by the factual similarity of the evidence, as it is here. *See State v. Mink*, 146 Wis. 2d 1, 16, 429 N.W.2d 99 (Ct. App. 1988); *State v. Plymesser*, 172 Wis. 2d 583, 596, 493 N.W.2d 367 (1992); *State v. Kuntz*, 160 Wis. 2d 722, 749, 467 N.W.2d 531 (1991). It is also significant that the other-acts evidence presented to the jury in this case provided important context for Jemison's conduct and, no less significantly, enhanced Teresa's credibility as the principal fact witness in this sensitive matter.

¶43 To that end, we also embrace here the applicability of the "greater latitude" rule—established and invoked by "the need to corroborate the victim's testimony against credibility challenges." *Davidson*, 236 Wis. 2d 537, ¶40. Plainly, Jemison and Teresa were the only witnesses to the sexual assault, rendering proof issues, including assessments of the credibility of these two by the jury, pivotal and so justifying a more liberal, justice-based application of the *Sullivan* standards.

¶44 Finally, we hold that, contrary to Jemison's advocacy, he has failed to establish that any risk of unfair prejudice attendant upon the admission of his prior sexual assault convictions substantially outweighs the probative value of it.

---

[5] While Teresa was an adult when Jemison sexually assaulted her, the victims in the 1993 and 2003 cases were thirteen-years old and sixteen-years old, respectively.

"Essentially, probative value reflects the evidence's degree of relevance. Evidence that is highly relevant has great probative value, whereas evidence that is only slightly relevant has low probative value." *Hurley*, 361 Wis. 2d 529, ¶87 (citation omitted). Stated differently, the assessment of probative value mirrors if not duplicates the related relevancy analysis contemplated by the second prong in *Sullivan*.

¶45 As noted previously, the other-acts evidence tendered by the State has probative value because of the abundant similarities to the offense conduct in this case—not diminished or compromised by the temporal remoteness or behavioral dissimilarity that Jemison identifies. Furthermore, any danger of unfair prejudice was minimized, if not eliminated entirely, by the circuit court's standard, intelligible, cautionary instruction to the jury.

¶46 Jemison has not met his burden of proof in demonstrating that the admission of the other-acts evidence constituted error that was fundamental, obvious, and substantial. *See Jorgensen*, 310 Wis. 2d 138, ¶21. To the contrary, it was offered by the State for wholly admissible purposes, was highly relevant to the central issues presented, and was not substantially outweighed by the risk of prejudice to the trier of fact. Accordingly, the circuit court did not erroneously exercise its discretion in permitting the introduction of the previous criminal convictions.

### 3. Reading the criminal complaints instead of live witness testimony

¶47 Jemison additionally objects to the manner in which the other-acts evidence was presented to the jury—that is, by reading to its members certain portions of the underlying criminal complaints. He contends that, because the State was not required to offer live witness testimony as to the events and

circumstances in those pleadings, he was denied his constitutional right to confrontation. We disagree.

¶48 It appears that Jemison's objections to this process are rightly assessed under plain error standards, mandating (as before) that he demonstrate that the circuit court judge's purported error in permitting the reading of the complaints rather than eliciting witness testimony was fundamental, obvious, and substantial. *See Id.* However, the Confrontation Clause of the Sixth Amendment to the Constitution, upon which Jemison relies, applies only to testimonial statements communicating testimonial evidence against an accused person. *Crawford v. Washington*, 541 U.S. 36, 53-56 (2004).

¶49 Statements that are not created for the purpose of trial testimony do not implicate the protections of the Confrontation Clause and are admissible as long as the rules of evidence permit their admission. *State v. Reinwand*, 2019 WI 25, ¶23, 385 Wis. 2d 700, 924 N.W.2d 184. Here, the information in the criminal complaints was not testimonial, and the pleadings themselves were self-authenticating under WIS. STAT. § 909.02(12), requiring no foundation or authentication for their admissibility.

¶50 Stated differently, the certified criminal complaints to which Jemison objects were not created as evidentiary substitutes for trial testimony; accordingly, they are not, by their nature, testimonial. Beyond this qualitative aspect, the Confrontation Clause is fully satisfied when the challenged evidence bears some "particularized guarantees of trustworthiness[.]" *State v. Manuel*, 2004 WI App 111, ¶26, 275 Wis. 2d 146, 685 N.W.2d 525. These officially certified, publicly-filed, and fully accessible criminal complaints fall squarely within that category.

¶51 Perhaps most compellingly, the right that Jemison now asserts—that is, to confrontation of the witnesses against him—was waived by his guilty pleas in those cases, as reflected by the fact that a plea is, by its nature, an admission of a party opponent. *See* WIS. STAT. § 908.01(4)(b); *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993). Accordingly, the criminal complaints that were read to the jury in this case were public, self-authenticating records rightly used to establish the other-acts evidence that had been rightly and appropriately admitted; as non-testimonial documents, the mandates of the Confrontation Clause did not apply to them, and there is thus no basis upon which to conclude that the trial judge committed a fundamental, obvious, and substantial error when he permitted the State to read the relevant information to the jury.[6]

### 4. Conduct of an evidentiary hearing on ineffective assistance claim

¶52 As noted above, Jemison's final challenge on appeal is to the circuit court's decision not to conduct an evidentiary hearing on his claim of ineffective assistance of counsel; that claim is itself based upon his claim that his attorney failed to object to the introduction of the other-acts evidence described and discussed above. It is, of course, well established that, to succeed on a claim of ineffective assistance of counsel, the defendant must demonstrate *both* that his or her attorney's performance was deficient *and* that this deficiency prejudiced him or her in some identifiable manner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hill v. Lockhart*, 474 U.S. 52, 58-59 (1985).

---

[6] Because of the nature of these conclusions about the other-acts evidence against Jemison—including that the circuit court committed no plain error in their admission or in the manner of their presentation to the trier of fact—we do not reach and so do not address the issue of "harmless error."

17

¶53    A showing of deficient performance by counsel requires evidence "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  The burden imposed on a defendant to show prejudice is equally high.  To meet that standard, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

¶54    Once a defendant has properly alleged in a postconviction motion that trial counsel was ineffective, the circuit court may hold a hearing to evaluate the merits of the defendant's claim.  *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).  However, the court retains discretion to deny a postconviction motion without a hearing if the motion "fails to allege sufficient facts to raise a question of fact, presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief." *State v. Roberson*, 2006 WI 80, ¶43, 292 Wis. 2d 280, 717 N.W.2d 111 (citations omitted); *see also State v. Ruffin*, 2022 WI 34, ¶¶28, 35, 401 Wis. 2d 619, 974 N.W.2d 432.

¶55    Where, as here, the circuit court has declined to conduct a *Machner* hearing, this court reviews *de novo* whether the postconviction motion alleged information which, if true, was sufficient to require the circuit court to conduct a hearing.  *State v. Bentley*, 201 Wis. 2d 303, 308, 548 N.W.2d 50 (1996).  Jemison contends that his allegations of ineffective assistance of counsel as asserted in his postconviction motion entitled him to such an evidentiary hearing.

¶56    The record is clear that the postconviction court denied Jemison's request for that hearing on the grounds that the other-acts evidence was properly admitted under the *Sullivan* standards; that the admission of Jemison's

convictions, presented in conjunction with the complaints, was proper; and that the State did not violate Jemison's right to confrontation when it read from those prior complaints. Significantly, the court stated that, even if Jemison's counsel had raised objections to the introduction of the prior criminal convictions, it would have overruled them.

¶57    Under these circumstances, it is equally clear that Jemison would have been unable to show that he was prejudiced by the conduct of his attorney. Accordingly, our *de novo* analysis, necessarily including an assessment of the arguments in the postconviction motion, fails to support Jemison's position that he received ineffective assistance of counsel at trial and that he should have been afforded an evidentiary hearing on that issue.

## CONCLUSION

¶58    For all of the reasons set forth above, we conclude that the State met its burden of proof in establishing that the defendant had sexual intercourse with the victim; that the circuit court did not err in permitting the State to introduce other-acts evidence of prior convictions; and that the court did not err in finding without merit the defendant's claim of ineffective assistance of counsel absent an evidentiary hearing. Accordingly, we affirm.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.