COURT OF APPEALS
DECISION
DATED AND FILED

August 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP116**

STATE OF WISCONSIN

Cir. Ct. No. **2015ME206**

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE MENTAL COMMITMENT OF M. J.:

BROWN COUNTY,

PETITIONER-RESPONDENT,

V.

M. J.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Brown County: BEAU G. LIEGEOIS, Judge. *Affirmed.*

¶1 HRUZ, J.[1] Max[2] appeals orders for his involuntary commitment pursuant to WIS. STAT. § 51.20 and for involuntary medication and treatment

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

pursuant to WIS. STAT. § 51.61(1)(g). Max argues that Brown County presented insufficient evidence to prove (1) that he is currently dangerous under § 51.20 and (2) that he is incompetent to refuse medication. For the reasons that follow, we disagree and affirm the circuit court's orders.

## BACKGROUND

¶2 Max was emergently detained in March 2015 after he "walked around in the snow in slippers with no jacket for 45 minutes" and subsequently jumped out of a moving vehicle. After a probable cause hearing and a final hearing, the circuit court entered orders for Max's involuntary commitment and for involuntary medication and treatment. Since 2015, the County has filed annual petitions to extend Max's involuntary commitment, and the circuit court has annually ordered that Max's involuntary commitment be extended and annually ordered his involuntary medication and treatment.

¶3 In July 2024, the County filed its most recent petition to extend Max's commitment and order his involuntary medication and treatment. Max was evaluated by Dr. James Black, a psychologist, and Dr. Leslie Taylor, a psychiatrist. The matter then proceeded to a contested hearing, during which Taylor, Elizabeth Lamoreaux (Max's case manager), and Max testified.

¶4 Doctor Taylor testified that she did not see Max when she attempted to perform her examination because he refused to meet with her, but she also stated that she was able to review collateral information to prepare her report.

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

2

Based on that collateral information, Taylor opined that Max is mentally ill and diagnosed him with schizoaffective disorder and obsessive-compulsive disorder. Taylor stated that both illnesses are treatable but that Max has "a consistent belief that he does not have a mental illness and therefore does not need psychotropic medications."

¶5 Doctor Taylor further explained that Max "has a significant history of noncompliance" with his medication and that Max was taken from his commitment facility and hospitalized in an inpatient unit as recently as October and November 2023 because he was refusing his medication. During that hospitalization, Max was transitioned from an oral medication to a long-acting injectable medication. Taylor opined that Max was "incapable of applying a proper understanding of the advantages, disadvantages, and alternatives to treatment" and, consequently, was not competent to refuse medication or treatment.

¶6 Doctor Taylor also opined that Max would be a proper subject for commitment if treatment were withdrawn. Taylor explained that if the commitment were not extended, Max "might leave the group home, he might start to refuse medication. And historically when he has not been treated for his mental illness, he has engaged in aggressive behaviors."[3] Taylor also noted that Max

---

[3] We further note that, according to Max's treatment records, he has a history of medication noncompliance and a history of "[f]requently attempt[ing] to manipulate providers/staff regarding stopping [his medications], altering [the] doses, [and changing the] types of medications." Max's records also state that he [a]dmits to [the] writer [that he] wouldn't take medications voluntarily," and he "[d]oesn't feel [he] is mentally ill [and] therefore doesn't need medications." We consider Max's treatment records pursuant to WIS. STAT. § 51.20(1)(am) and pursuant to Max's refusal to meet with Dr. Taylor. *See infra* ¶¶16, 20 n.9.

struggles with basic hygiene.[4] Taylor's report was admitted into evidence without objection.

¶7 Lamoreaux testified that she worked with Max in her role as a case manager for the County and that she filed the petition for an extension of Max's commitment due to concerns about Max refusing his oral medications and him requesting that injectable medications be discontinued. Specifically, Lamoreaux noted that since Max returned to his commitment facility after his 2023 inpatient stay, he has refused oral medications approximately three to six times per month.[5]

¶8 Max testified that he had not refused oral medication three to six times per month and that "[t]here was probably one or two months … where I missed up to four times but that was probably the highest." Max represented that he does "see the benefit of taking medication by mouth" and that he "even like[s] the injectable form." Max also stated, however, that the injectable medication has made him feel suicidal and that he does "not like that feeling." Max expressed that he would be open to trying oral medication again if the injectable medication were discontinued.

---

[4] Doctor Taylor explained that Max's "struggles" with hygiene include him not showering; mold developing in his room; his room requiring "constant cleaning"; and Max picking at his skin, which can lead to infection.

[5] We note that Dr. Taylor stated that Max was transitioned from oral medications to injectable medications during his hospitalization and that Lamoreaux later said, "particularly after he returned from an inpatient stay in November of 2023, there have been approximately between three to six times per month that he has refused his oral medications." We question how Max continued to refuse oral medication after being transitioned to the long-acting injectable form of medication. The record indicates that Max used to receive two oral doses of medication per day, but the record is unclear as to how long the transition to a long-acting injectable form took or if there was a time when Max was prescribed both a long-acting injectable medication and an oral medication. However, this unknown information does not ultimately affect our analysis.

¶9     Ultimately, the circuit court found that Max continued to be mentally ill, that he was currently dangerous under WIS. STAT. § 51.20(1)(a)2.c. and (1)(am) due to his history of medication noncompliance and aggressive behavior when unmedicated, and that he was a proper subject for treatment. The court also found that Max was not competent to refuse medication or treatment because he was incapable of expressing an understanding of the advantages and disadvantages of, and alternatives to, medication due to his mental illness. The court entered orders extending Max's commitment for one year and for Max's involuntary medication and treatment during that time.

¶10     Max now appeals. Additional facts will be provided as necessary below.

## DISCUSSION

¶11     Max argues that the County failed to present sufficient evidence to prove that he is currently dangerous and that he is incompetent to refuse medication.[6] Whether the County has met its burden of proof to support the extension of Max's commitment and Max's involuntary medication and treatment presents mixed questions of law and fact. *See Waukesha County v. J.W.J.*, 2017 WI 57, ¶15, 375 Wis. 2d 542, 895 N.W.2d 783; *Outagamie County v. L.X.D.-O.*, 2023 WI App 17, ¶22, 407 Wis. 2d 441, 991 N.W.2d 518. "We uphold a circuit court's findings of fact unless they are clearly erroneous. Whether the facts satisfy the statutory standard[s] [are] question[s] of law that we review de novo." *J.W.J.*, 375 Wis. 2d 542, ¶15.

---

[6] Max does not contest that he is mentally ill and a proper subject for treatment.

¶12    For a person to be subject to a WIS. STAT. ch. 51 involuntary commitment, the petitioner must prove by clear and convincing evidence that the subject individual is (1) mentally ill, (2) a proper subject for treatment, and (3) dangerous to himself or herself or to others. *Langlade County v. D.J.W.*, 2020 WI 41, ¶29, 391 Wis. 2d 231, 942 N.W.2d 277. WISCONSIN STAT. § 51.20(1)(a)2. provides five different means of proving that the subject is dangerous. *D.J.W.*, 391 Wis. 2d 231, ¶30. "The dangerousness standard is not more or less onerous during an extension proceeding"; "[e]ach extension hearing requires proof of *current* dangerousness." *Portage County v. J.W.K.*, 2019 WI 54, ¶24, 386 Wis. 2d 672, 927 N.W.2d 509. However, "[b]ecause an individual's behavior might change while receiving treatment, WIS. STAT. § 51.20(1)(am) provides a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior to commencement of the extension proceedings." *Id.*, ¶19.

¶13    Max was found dangerous under WIS. STAT. § 51.20(1)(a)2.c. and 51.20(1)(am). Section 51.20(1)(a)2.c. provides that a subject individual is dangerous if he or she "[e]vidences such impaired judgment, manifested by evidence of a pattern of recent acts or omissions, that there is a substantial probability of physical impairment or injury to himself or herself or other individuals." Section 51.20(1)(am) provides:

> If the individual has been the subject of inpatient treatment for mental illness, developmental disability, or drug dependency immediately prior to commencement of the proceedings as a result of a voluntary admission, a commitment or protective placement ordered by a court under this section … the requirements of a recent overt act, attempt or threat to act under par. (a)2. a. or b., pattern of recent acts or omissions under par. (a)2. c. or e., or recent behavior under par. (a)2. d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be

a proper subject for commitment if treatment were withdrawn.

¶14 Max argues that Dr. Taylor's testimony did not provide an evidentiary basis to extend his involuntary commitment because he refused to meet with her and, consequently, Taylor conducted her evaluation based on collateral records. Max characterizes Taylor's testimony as consisting of "assumptions," "hypotheticals," and "conclusory opinions." Therefore, Max asserts that this evidence failed to rise to the level of clear and convincing evidence of his dangerousness.

¶15 We reject Max's argument. First, although Max cites case law to support general concerns regarding the use of hearsay evidence in both WIS. STAT. ch. 51 cases and other cases, he cites no case law indicating that hearsay cannot support a finding of dangerousness by clear and convincing evidence.[7] *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered."); *Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("[W]e will not abandon our neutrality to develop arguments.").

---

[7] We note that Max does not appear to argue that the hearsay was erroneously admitted into evidence but rather that the hearsay provided by Dr. Taylor is incapable of providing clear and convincing evidence of a subject's dangerousness. To the extent that Max does intend to challenge the admission of Dr. Taylor's hearsay evidence, we note that he failed to object to Taylor's testimony at trial, and "parties waive any objection to the admissibility of evidence when they fail to [object to its admission] before the circuit court." *See State v. Edwards*, 2002 WI App 66, ¶9, 251 Wis. 2d 651, 642 N.W.2d 537. While we could analyze the admission of unobjected-to hearsay under the plain error doctrine, *see State v. Jorgensen*, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77, Max has not argued before this court that the admission of Dr. Taylor's testimony was plain error, *see Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

¶16 Second, we note that WIS. STAT. § 51.20(1)(am)—one avenue under which Max was found dangerous—appears to expressly allow the consideration of hearsay evidence. *See **Portage County v. D.P.W.O.**,* No. 2023AP1975, unpublished slip op., ¶26 (WI App Mar. 7, 2024) (concluding that the circuit court's reliance on unobjected-to hearsay was not plain error because, in part, § 51.20(1)(am) expressly allows the consideration of hearsay evidence through the subject individual's treatment records).[8] Section 51.20(1)(am) provides that the "pattern of recent acts or omissions under par. (a)2. c. or e. … may be satisfied by a showing that there is a substantial likelihood, *based on the subject individual's treatment record*, that the individual would be a proper subject for commitment if treatment were withdrawn." (Emphasis added.) Max does not address in his briefs § 51.20(1)(am)'s express reference to treatment records, which are inherently hearsay evidence.

¶17 Third, we disagree with Max's characterization of the evidence presented at the hearing as containing only "assumptions," "hypotheticals," and "conclusory opinions." Both Dr. Taylor and Lamoreaux testified that Max was hospitalized during the prior year. Taylor explained that this hospitalization happened because Max was refusing his oral medication and his symptoms began to worsen. Lamoreaux stated that, after the hospitalization, Max continued to refuse his oral medications "three to six times per month" due to Max being "very particular about the color, shape, and inscriptions on his oral medications."

---

[8] Unpublished opinions authored by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

¶18 Doctor Taylor testified that, due to these refusals, Max was transitioned to a long-acting injectable form of medication. However, Lamoreaux testified that Max does not like the injectable form of medication "because he doesn't like the act of being injected in the rear." Further, Max testified that he disliked the injectable medication because "in the past the action of getting the injectable medication has made [him] suicidal." Max requested that he be returned to the oral medication that he was previously receiving.

¶19 Doctor Taylor testified that if Max's commitment were not extended, he "might start to refuse medication." Further, Taylor explained that Max's history shows that he engages in aggressive behaviors and begins to struggle with basic hygiene when unmedicated.

¶20 The above evidence sufficiently shows that Max is dangerous under WIS. STAT. § 51.20(1)(a)2.c. in conjunction with § 51.20(1)(am). Specifically, there is evidence that Max has struggled in the past and, more importantly, continues to struggle with his medication, that he deeply dislikes the injectable form of medication he is currently receiving, and that he does not consistently take his oral medications. Further, Max needed to be hospitalized in the year preceding the hearing due to medication refusals. When off his medication, he engages in "aggressive" behaviors and struggles with basic hygiene, such that he does not shower, mold grows in his room, and he picks at his face, possibly causing infection. While the County certainly could have provided more detailed information during the hearing—such as Max's specific behaviors leading up to his most recent hospitalization, the ways in which he acts aggressively when unmedicated, or symptoms Max still exhibits when fully medicated—the above-

referenced facts are sufficient to show dangerousness. Accordingly, we affirm the order extending Max's involuntary commitment.[9]

¶21 We turn now to the order for Max's involuntary medication and treatment. Pursuant to WIS. STAT. § 51.61(1)(g), "a person has the right to refuse medication unless a court determines that the person is incompetent to make such a decision." *Outagamie County v. Melanie L.*, 2013 WI 67, ¶53, 349 Wis. 2d 148, 833 N.W.2d 607. Further, "an individual is presumed competent to refuse medication or treatment." *Id.*, ¶89.

> [A]n individual is not competent to refuse medication or treatment if, because of mental illness, developmental

---

[9] Additionally, we question the appropriateness of challenging the sufficiency of the evidence solely due to hearsay when Dr. Taylor was forced to rely on collateral records due to Max's refusal to meet with her. While it is uncontested that Max had the right to remain silent during the examination, *see* WIS. STAT. § 51.20(9)(a)4., he did not have the right to fully skip the court-ordered examination, *see Walworth County v. C.A.E.*, No. 2020AP834-FT, unpublished slip op., ¶3 (WI App Sept. 16, 2020). Taylor was still required to perform an examination and file a report with the circuit court. *See* § 51.20(9)(a)5. Indeed, the requirement that a subject individual be examined before each commitment hearing and extension hearing is a part of the procedural safeguards set in place to protect the subject's liberty interests. *See Outagamie County v. M.J.B.*, 2025 WI App 37, ¶22, —Wis. 2d —, — N.W.3d —.

There is a similar line of cases in which this court has analyzed a subject's decision not to attend or to prematurely leave his or her WIS. STAT. ch. 51 medical examination and the subject's right to have the advantages and disadvantages of, and alternatives to, medication explained to him or her. *See Outagamie County v. L.X.D.-O.*, 2023 WI App 17, ¶¶20-44, 407 Wis. 2d 441, 991 N.W.2d 518; *see also Douglas County v. K.A.D.*, No. 2023AP1072, unpublished slip op., ¶¶14-29 (WI App Feb. 13, 2024). In *L.D.X.-O.*, this court rejected the subject's argument that the subject could refuse to engage with the examiner and then argue that he or she was not given the required explanations. *See L.D.X.-O.*, 407 Wis. 2d 441, ¶40 (concluding that agreeing with the subject "would be devastating to a county's ability to treat patients in Chapter 51 commitments and would produce an absurd result" because "[p]atients could avoid the discussion, and consequently a medication order, simply by walking away from the conversation").

Similar considerations would seemingly be applicable regarding Max's refusal to meet with Dr. Taylor for the purpose of establishing dangerousness. However, because we conclude that the evidence presented at the hearing was sufficient to prove Max's dangerousness, we need not and do not reach a conclusion on this issue. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground.").

disability, alcoholism or drug dependence, and after the advantages and disadvantages of and alternatives to accepting the particular medication or treatment have been explained to the individual, one of the following is true:

a. The individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives.

b. The individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.

Sec. 51.61(1)(g)4.

¶22 At the extension hearing, the circuit court noted that Max's involuntary commitment began in 2015; that he has had close to 30 hospitalizations; and that during the most recent hospitalization, Max was aggressive and had "inappropriate behaviors." The court then stated that it was ordering Max's involuntary medication and treatment based on that history. In its written order, the court specified that Max was not competent to refuse medication because he was "incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives."

¶23 On appeal, Max argues that the County presented "no evidence" to prove that he is incapable of expressing an understanding of the advantages and disadvantages of, and alternatives to, medication. We agree with Max in this regard.

¶24 Doctor Taylor testified that Max has had a "consistent belief that he does not have a mental illness and therefore does not need psychotropic medications." Taylor further opined that Max was not competent to refuse

medication because he was incapable of applying a proper understanding of the advantages and disadvantages of, and alternatives to, medication. However, Taylor never testified that Max was incapable of expressing an understanding of the advantages and disadvantages of, and alternatives to, medication.

¶25 In fact, Max testified that he did "see the benefit of taking medication by mouth and even like[d] the injectable form." He stated, "Sometimes I feel like it does help me somewhat. But just the fact that in the past the action of getting the injectable medication has made me suicidal." We also note, however, Lamoreaux's testimony that, after the hospitalization, Max continued to refuse his oral medications "three to six times per month" due to Max being "very particular about the color, shape, and inscriptions on his oral medications."

¶26 Based on these facts, we cannot conclude that there is clear and convincing evidence that Max is incapable of expressing an understanding of the advantages and disadvantages of, and alternatives to, medication. However, we conclude that this evidence—particularly Max's continued struggles with both the injectable form and oral form of his medications—sufficiently proves that Max is substantially incapable of applying an understanding of the advantages and disadvantages of, and alternatives to, his medication to his condition. In other words, it appears there is dissonance between Max's stated understandings and his conduct in terms of avoiding the very dangers to himself caused by his mental illnesses, for which he is a proper subject for treatment. Accordingly, we conclude that Max is not competent to refuse medication and affirm the order for Max's involuntary medication and treatment.

*By the Court.*—Orders affirmed.

12

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.